234 N.J. Super. 311 (1989)
560 A.2d 1240
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
WILLIAM JENKINS, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Submitted June 14, 1989.
Decided June 30, 1989.
*313 Before Judges BILDER, R.S. COHEN and ARNOLD M. STEIN.
Alfred A. Slocum, Public Defender, attorney for appellant (William E. Norris, Designated Counsel, of counsel and on the brief).
Peter N. Perretti, Jr., Attorney General, attorney for respondent (Chana Barron, Deputy Attorney General, of counsel and on the brief).
The opinion of the court was delivered by R.S. COHEN, J.A.D.
Defendant was indicted for second degree aggravated assault of his wife, Juanita Jenkins (N.J.S.A. 2C:12-1b(1)); third degree possession of a handgun without a permit (N.J.S.A. 2C:39-5b), and second degree possession of the gun with purpose to use it unlawfully against the person of another (N.J.S.A. 2C:39-4a). Tried to a jury, he was acquitted of aggravated assault, convicted of the undercharge of simple assault, and convicted of both gun possession charges. The sentences aggregated seven years with a minimum Graves Act term of three years. Defendant appealed. For a combination of reasons, we reverse all of the convictions.
The State and defendant agree on a great many of the facts. In August 1986, defendant and his wife of six years, companions for a total of 17 years, were not getting on as well as they once did. One day after work, defendant stopped in a neighborhood bar and ordered a beer. His wife, seated across the bar, threw defendant a hostile question and he left. After defendant returned home, his teenage daughter became upset and tearful, because the wife had telephoned from the bar and said she was staying the night with her cousin Guendetta.
Defendant became angry  he says  because his wife had upset the daughter. He returned to the bar, had words with his wife and punched her in the face, knocking her off her barstool.
*314 Other patrons then eased defendant outside to the parking lot. Shortly thereafter the wife followed. What happened in the parking lot was the subject of divergent testimony. The jury could have believed that the daughter, another daughter of the wife  stepdaughter to defendant  and the stepdaughter's boyfriend had come to the parking lot, and that defendant and the boyfriend were arguing. The wife intervened and defendant hit her again, knocking her to the ground.
The next part of the episode is very murky. At trial the wife and daughter said they heard popping or firecracker-like sounds that could have been shots. They saw no gun. Cousin Guendetta heard noises from inside the bar, saw the wife running towards the bar, and saw the younger daughter come in and heard her say "He's shooting." In earlier statements to the police, the witnesses were clearer that shots were fired. A police report had the wife describing a .25 caliber automatic, a description that seemed to mystify her at trial.
A police officer who promptly arrived to investigate looked for but found no gun, cartridges, bullets, or bullet holes. No one ever knew defendant to own a gun or carry one. Defendant testified that the noise which sounded like shots must have been his car engine with its defective muffler backfiring in the parking lot as he prepared to drive off after hitting his wife the second time.
Over defendant's objection, the State's case included the wife's account of an Eastertime confrontation with defendant some three or four months before the incident in question. The wife said defendant became upset because she was selling charity breakfast tickets for a friend but refused to do so for defendant's fraternal organization. He punched and choked her and said he ought to kill her. Defendant was cross-examined about the incident. His was a kinder, gentler version, but he admitted there was some "wrestling." The evidence was admitted on the thesis that it bore on defendant's intent on the night in question. Evid.R. 55.
*315 Defendant's first complaint before us is that the court's instructions on N.J.S.A. 2C:39-4a were inadequate. We agree. The court correctly charged that, in order to convict, the jury had to find that the object was a firearm, that defendant possessed it, that defendant's purpose was to use it against the person of another, and that he intended to use it in a manner that was prohibited by law, that is, to commit an illegal act. State v. Harmon, 104 N.J. 189, 212 (1986).
It is impossible to say with any assurance what the jury thought was defendant's unlawful purpose. The problem arises from the fact that defendant was acquitted of aggravated assault, which means that the jury probably had a reasonable doubt that defendant fired a gun at his wife. It is apparent the jury believed he was carrying a gun, but not what it thought his purpose was in doing so.
In most cases, a charge of possession with unlawful purpose is coupled with a charge of an act accomplished with the gun  a robbery, an assault, a homicide  which the court tells the jury is unlawful. Conviction of such an unlawful act supplies the factual basis for an inference of unlawful purpose in possessing the gun. State v. Daniels, 231 N.J. Super. 555, 559 (App.Div. 1989). Cf. State v. Mieles, 199 N.J. Super. 29 (App.Div.), cert. den., 101 N.J. 265 (1985). But, if the possession charge stands alone, or if acquittal of the accompanying charge erases the identification of the unlawful purpose, the court may not permit the jury to convict on the basis of speculation as to what possible purposes qualify as unlawful.
Here, for instance, the jury might have thought defendant's purpose in carrying a gun was to impress his estranged wife, or to threaten her, or to lessen the chance of physical confrontation with others, or to fire the weapon into the air to avoid attack by others. The problem is pointed up by the State's summation, which included:
If you feel, for whatever reason, that he possessed that gun for an unlawful purpose, be it just to show somebody and scare somebody with, wave it around, then you must find him guilty of that charge. [Emphasis supplied.]
*316 A jury is not qualified to say without guidance which purposes for possessing a gun are unlawful under N.J.S.A. 2C:39-4a and which are not. For that reason, because a conviction for a coupled active crime cannot be counted on to supply the unlawful purpose,[1] a jury instruction on a charge of gun possession for unlawful purpose must include an identification of such unlawful purposes as may be suggested by the evidence and an instruction that the jury may not convict based on their own notion of the unlawfulness of some other undescribed purpose.
Defendant separately argues that the possession charge should not have been submitted to the jury at all because there was no evidence that defendant intended to use the gun unlawfully against the person of his wife. We disagree. The situation was instinct with aggressive and hostile emotions. The jury had sufficient evidence before them to convict.
Defendant next attacks the "other acts" evidence admitted under Evid.R. 55 concerning the Eastertime incident. Such evidence must be probative of one of the elements recited under the rule, such as motive or intent. This evidence did have some limited bearing on defendant's purpose in allegedly carrying and firing a gun on August 7  not on the likelihood of his doing so, but only on his purpose. The probative value of Evid.R. 55 evidence, however, must always be weighed against its inherent capacity to cause illegitimate prejudice against defendant. Evid.R. 4; State v. Garfole, 76 N.J. 445 (1978). That capacity is evident here. The wife's version of the Eastertime incident portrays defendant as a bad, aggressive man who reacts violently to slight provocation, and even makes a threat to kill.
The admissibility of Evid. R. 55 evidence is committed to the sound judgment of the trial court. State v. Ramseur, 106 N.J. *317 123, 266 (1987). This is a close case, and we might not find a mistaken exercise of judgment if the evidence had been effectively confined to its limited legitimate purpose.[2] What happened, however, was that the borderline decision to admit the evidence was trampled by the State in an inappropriate and excessive summation.
The assistant prosecutor virtually opened his summation with:
[T]his was not an isolated incident and I submit to you it's very likely to happen again. Except if it does, I submit to you that Mrs. Jenkins might not be so lucky. You might not get a chance to hear her testimony next time. As I said, this was not an isolated incident.
The next 21 lines of transcript are taken by a description not of the August incident but of the Eastertime confrontation.
A few pages later, the assistant prosecutor returned to the theme, in explaining why Mrs. Jenkins' testimony was so much less inculpatory than her initial statement to the police:
But I submit to you, that there may be another reason and that's what's going to happen tonight or tomorrow or the next day when she's back out on the street and maybe he's going to come after her again. Maybe she was just afraid to testify because she's afraid of what he might continue to do to her. Remember, this was not an isolated incident.... This whole mess started before August 7, 1986, and continued on to that date and I submit to you, will continue unless you all put an end to it and unless you all watch out for the safety of Mrs. Jenkins.
The prosecutor is a representative of the people, whose interest is not to convict but to pursue justice, and whose words carry heavy weight with the jury. State v. Marks, 201 N.J. Super. 514, 534-535 (App.Div. 1985), cert. den., 102 N.J. 393 (1986). It is for that reason that excessive or inaccurate use of evidence, and improper appeals to the jury in a prosecution summation are such dangers to a fair trial. Here the assistant prosecutor took Evid.R. 55 evidence which he himself sponsored as bearing only on defendant's purpose on August 7 and *318 transformed it without legal or factual justification into (1) proof that defendant was a violent man given to continual and accelerating physical abuse of his wife, and (2) proof that, if the jury did not convict, "put an end to it," and thus "watch out for" the wife's safety, it would happen again, with graver consequences, and this time the jurors would be responsible.[3]
There was no factual basis for the domestic crime wave the State conjured up. There was no legal justification for warning the jurors that the next incident had to be prevented or they would have it on their heads. Defense counsel made no objection to the improper arguments and the trial court did not intervene sua sponte. The court's charge as to the limited purpose of the evidence did not refer to the summation and was insufficient to cure the problem. We are satisfied that the situation presented, at the very least, a clear capacity to produce an unjust result as to every count of the indictment. R. 2:10-2.
The judgment of conviction is reversed. The matter is remanded to the Law Division.
NOTES
[1] We do not suggest that proof of unlawful use of the gun is alone sufficient to convict. It is necessary that defendant have possessed the weapon with intent to make an unlawful use of it. State v. Harmon, 104 N.J. 189, 209-211 (1986).
[2] At the retrial, if the State should offer the same evidence, the court should be guided by the Supreme Court's recent opinion in State v. Stevens, 115 N.J. 289 (1989), in which the Court discussed the inflammatory potential of such evidence.
[3] After imposition of the Graves Act sentence, the same assistant prosecutor did not object to defendant's release pending this appeal.