861 A.2d 110

STATE OF NEW JERSEY, PLAINTIFF–APPELLANT, v.
MICHAEL W. BANKO, A/K/A MICHAEL MCCABE,
DEFENDANT–RESPONDENT.

Argued September 13, 2004—Decided December 1, 2004.

*John J. Scaliti,* Assistant Prosecutor, argued the cause for appellant (*John L. Molinelli,* Bergen County Prosecutor, attorney).

*Donald Horowitz* argued the cause for respondent (*Mr. Horowitz,* attorney; *Mr. Horowitz, Kelly Berton Rocco* and *Jill Horowitz,* on the briefs).

Justice LaVECCHIA delivered the opinion of the Court.

In the matter before us, defendant was acquitted of kidnapping, attempted aggravated sexual assault, and aggravated assault

(pointing a firearm), and convicted of second-degree possession of a weapon for an unlawful purpose. The trial court vacated the weapons possession conviction and ordered a new trial based on a perceived inconsistency in the jury verdicts. The Appellate Division also held that the verdicts were inconsistent, but concluded that defendant was entitled to entry of a judgment of acquittal, not a grant of a new trial. *R.* 3:18–2.

We granted the State's petition for certification, *State v. Banko,* 179 *N.J.* 304, 845 *A.*2d 131 (2004), and now reverse. We reaffirm that a jury may render inconsistent verdicts so long as there exists a sufficient evidential basis in the record to support the charge on which the defendant is convicted. Here, there exists adequate evidence to support the jury's verdict of guilt on the unlawful possession charge. Therefore, defendant's conviction must be reinstated.

## I.

Defendant, Michael Banko, was charged with first-degree attempted aggravated sexual assault contrary to *N.J.S.A.* 2C:5–1, 2C:14–2a(4), first-degree kidnapping contrary to *N.J.S.A.* 2C:13–1b(1), fourth-degree aggravated assault by pointing a firearm contrary to *N.J.S.A.* 2C:12–1b(4), and second-degree possession of a weapon for an unlawful purpose contrary to *N.J.S.A.* 2C:39–4a. To address the specific sufficiency-of-the-evidence issue presented, we recount the relevant evidence as presented by the parties.

The parties do not dispute that defendant and the alleged victim, Carmen Miles, met the evening of Friday, April 30, 1999. A co-worker, Heather Hernandez, accompanied Miles to a Manhattan bar where they encountered defendant and Raymond Surgey. While the four had some rounds of drinks, Miles and defendant engaged in "getting-to-know-you" conversation.

Both defendant and Miles acknowledge that she spent a considerable portion of time talking about her relationship with her boyfriend, Tom. She and Tom had relocated from Georgia in the expectation that their relationship was leading toward marriage,

and had moved in with Tom's parents in an apartment in Spring Valley, New York. However, recently their relationship had deteriorated. Suffice it to say that on April 30, 1999, Miles was expressing her disappointment, at times emotionally, about the turn of events in her life.

Miles informed her companions that she had to catch a 9:30 p.m. bus from the Port Authority to get home to Tom's parents' residence. She referred again to the 9:30 bus when, later, the topic of getting some dinner arose. Nonetheless, she decided to stay because both Hernandez and defendant reassured her that they would "make sure she would get home." Although the record is unclear, it appears that Raymond was involved with a car service and that he had access that night to a car and driver. Accordingly, all four went to Tattoo's, a restaurant and dance club/bar, where they engaged in further socializing. There was divergent testimony about whether Miles and defendant kissed while dancing together or engaged in other exchanges that were indicative of mutual romantic interest. To be sure, defendant's description of the evening's encounter portrayed Miles as appearing to be interested in him. Miles testified that she was enjoying the dancing and conversation and that everyone was having a good time.

According to Miles, she raised the subject of leaving because she was concerned about getting home before one o'clock. It was agreed that Raymond's car and driver would transport Miles and defendant from Tattoo's to defendant's home, and then the driver would return to Tattoo's to pick up Raymond. Miles explained that she did not want defendant to know where she lived, so she agreed to be transported to defendant's apartment, which was located along her route home. Defendant had promised to call for another car to take her home from there.

When they arrived, Miles followed defendant into his apartment and waited near the foyer while he went immediately into the bathroom. When he emerged, he entered another adjacent room that she thought was a bedroom. She expected to see him return

with a phone.  Instead, he reappeared with a gun that he held pointed toward her.  In a "cold" voice, he told her not to scream. Trembling and crying, she asked him to let her leave and reminded him that she did not live alone.  He reminded her that no one knew where or with whom she was.  He informed her that they would have sexual relations and she would enjoy it, and that afterwards they would have some breakfast.  She described his condition as agitated and becoming increasingly so whenever she cried, so she tried to calm him by conversing and acting in such a way to make him think that she would cooperate with his wishes. (For example, she assisted him in unbuttoning his shirt).

Eventually, Miles was able to flee the apartment.  Her escape was made possible when she suggested that defendant, who wanted them to play strip poker, go into his kitchen to look for playing cards.  While he was out of the room, she ran to the front door, unlocked it, and escaped.  Outside she screamed and banged on car hoods and apartment doors until she was allowed into the apartment of Arnold and Carol Nussbaum after they heard her crying.  The police were called and arrived shortly thereafter; Miles was transported to the police station, questioned and treated by paramedics for a knee abrasion.  She was unable to provide the police with defendant's last name or to identify his apartment.[1]

Defendant's version of the latter portion of the evening differed in two key respects: (1) his presentation and use of the gun and (2) the nature of his interactions with Miles.  According to him, they went to his apartment by mutual consent and Miles acted in a manner that was suggestive of intimacy.  While they were relaxing together on the living room couch watching television, Miles

---

[1] When she ran from the apartment, Ms. Miles was shoeless, coatless, and without the two bags she had had with her that evening. She explained that defendant made her remove her coat, which was folded over the opposite end of the couch in the living area (beyond her reach) from where she was sitting close to the front door.  She was shoeless because defendant had requested that she remove her heeled shoes upon her initial entry because the sound of her shoes on the hardwood flooring would disturb his downstairs neighbors.  Thus, her shoes, bags, and coat were not near the front door when she escaped.

resumed talking about her relationship with Tom. She began to cry and, according to defendant, became "hysterical," stating repeatedly that she could not believe that she had let herself get into the situation in which she found herself—namely moving to New York in anticipation of marrying Tom and, then, having that relationship fall apart.

As she remained inconsolable sitting on the couch near to him, defendant began to wonder what to do. As he put it, it was late at night, he was exhausted and had had some drinks that night, and he had in his apartment a woman crying about her former boyfriend. He tried to reassure her that she would be fine and offered to help her search for a place to live. Eventually, he got up from the couch to "get some distance," and went to sit on the radiator opposite the couch. He decided to call a car to take her home and told her that he was going to do so. However, when he went into another room to make that call, he heard the screen door slam and found that Miles was gone. He stated that he later heard a woman scream outside, but never saw Miles again that evening. He fell asleep with the lights and television on. Although he left the front door open, she did not return during the night or the next morning to get the shoes, coat, and bags that she had left behind. He was able to secure her work telephone number from information obtained from a pay stub that was in one of her bags and called that number on Monday and Tuesday, leaving messages about contacting her to give back her things. He succeeded in speaking to her at the work number on Wednesday, May 5. According to Miles, in that conversation defendant said that his name was "Michael McCabe." After his call, she contacted the police and they were able to locate defendant. He cooperated with their investigation, consenting to searches of his car and apartment.

In defendant's version of events, he admits that he showed Miles his BB gun and told the police that he did when questioned. The subject of firearms had come up during the initial conversations in the bars. Miles told him that her father had taught her

how to shoot when she was younger, and she mentioned that Tom had a gun. According to defendant, he showed her his BB gun to be "cool." To reassure her that it was not loaded, he pointed it at the television and pulled the trigger. According to him, she expressed surprise at how realistic it appeared, and reached out to hold it. He offered to let her take the gun home with her, but she declined so he placed it under the couch where they were sitting at the time. Later, when she began to express fright and became emotional about the "heat" she would receive for not going home at an early hour, defendant offered her the gun again. She declined, but remained distraught and so defendant tried to get her to relax and stop crying. He also reached under the couch to hold onto the BB gun, placed the gun in his lap, and then held it there for awhile. He stated that he may have cocked the trigger a few times before returning the gun underneath the couch. As noted earlier, he then moved from the couch to the radiator, eventually leaving the living room to telephone for a car service to take Miles home.

The jury heard the differing versions of what transpired and convicted defendant of the charge of possession of a weapon for an unlawful purpose, but acquitted him of the three other charges. The trial court had instructed the jury as follows on the unlawful purpose charge:

> The Fourth Count of the indictment charges the defendant, Michael Banko, also known as Michael McCabe, with the crime of possession of a firearm with the purpose to use it unlawfully against a person. The statute on which the count of the indictment is based reads in pertinent part, "Any person who has in his possession any firearm with a purpose to use it unlawfully against a person is guilty of a crime."
>
> In order for you to find the defendant guilty of this charge, the State has the burden of proving beyond a reasonable doubt each of the following four elements of this crime:
>
> Number 1, [that the BB gun] is a firearm.
>
> Number 2, the defendant possessed the firearm.
>
> Number 3, the defendant possessed the firearm with the purpose to use it against a person.
>
> Number 4, the defendant's purpose was to use the firearm unlawfully.

On the fourth element, the trial court instructed the jury that

the State must prove beyond a reasonable doubt ... that the defendant had a purpose to use the firearm in a manner that is prohibited by law. I've already defined purpose for you. This element provides that you find that the State has proven beyond a reasonable doubt that the defendant possessed the firearm with the conscious objective, design or specific intent to use it against a person in an unlawful manner as charged in the indictment and not for some other purpose.

In this case the State contends that the defendant's unlawful purpose in possessing the firearm was to unlawfully confine Carmen Miles with the purpose to commit the crime of aggravated sexual assault upon Carmen Miles.

You must not rely on your own notions of the unlawful purpose of the defendant. Rather, you must consider whether the State has proven the specific unlawful purpose charged. The unlawful purpose alleged by the State may be inferred from all that was said or done and from all the surrounding circumstances of this case.

During the jury's deliberations it sent to the court several notes with questions on a variety of topics. One question, relating to the unlawful purpose charge, asked

It is our reading of the counts that if a guilty verdict is found in Count 4 [possession of the B.B. gun for an unlawful purpose] a guilty verdict must also be found on either aggravated sexual assault or kidnapping. We believe this specifically [sic] the fourth element states: In this case the State contends that the defendant's unlawful purpose in possessing the firearm was to unlawfully confine Carmen Miles for the purpose to commit the crime of aggravated sexual assault on Carmen Miles.

The court conferred with counsel and then instructed the jury that it was obligated to consider each offense separately and to render a verdict on each count. The jury foreman indicated that he did not think that the court's response answered the jury's question, to which the court responded, "Well, perhaps it may be helpful, you must render a verdict as to each count individually. Does that help you?" The foreman's response was "somewhat." The exchange continued:

THE FOREMAN: I don't know if we're allowed to articulate our concern.

THE COURT: Why don't you do this? Keeping in mind each count is a separate offense and you have to render your verdict as to each charge. If you have a further question let me know.

A lunch recess was taken, after which a juror disqualification issue arose, resulting in an alternate juror being seated. The jury was instructed to begin deliberations anew. During the new deliberations, the jury sent a note that it had reached a verdict on two counts but that it was unable to reach unanimity on the

remaining two charges. Again the court consulted with counsel; read back to the jury a portion of the original charge, and sent the jury back to continue its deliberations. Approximately an hour later, the jury returned its verdict of guilt on the possession of a weapon charge, and its verdicts of not guilty on the other charges. Defendant moved for a new trial pursuant to *Rule* 3:20–1. The court granted the motion, finding that the verdict was against the weight of the evidence. The court reasoned that the unlawful purpose conviction was "legally incongruous" with the verdicts on the other counts and, as a result, concluded that "the evidence [wa]s insufficient to show the unlawful purpose of using the weapon." The court's letter opinion explained that

> The State's proofs suggested that the weapon was an implement used to facilitate and enforce defendant's alleged desire of having sexual intercourse with Carmen Miles. However, the jury found defendant not guilty of attempted aggravated sexual assault, aggravated assault, and kidnapping. The not guilty finding on these three counts negates a finding of guilt as to count four, unless an independent unlawful purpose is proved. If there was some other unlawful purpose for which the defendant could have used the pistol on May 1, 1999, it was not supported by the evidence at trial. The State's evidence was insufficient to prove such other purpose; therefore, a reasonable jury could not have found an unlawful purpose for the use of the firearm on the proofs presented.

The State moved for leave to appeal the grant of a new trial, which the Appellate Division denied. The State then moved before this Court for leave to appeal and for summary reversal. We granted leave to appeal and directed the Appellate Division to hear the merits of the State's appeal. The Appellate Division then rendered the judgment before us. It determined that the jury's verdict of guilt on the unlawful purpose charge was inconsistent with its acquittal of defendant on the substantive offenses charged (kidnapping, attempted aggravated sexual assault, and aggravated assault with a firearm), and held that the acquittals demonstrated the lack of a sufficient evidential basis in the record for the unlawful purpose element of defendant's weapons conviction. This appeal is now here on the State's petition for certification, which raises the question whether the jury's failure to convict on attempted aggravated sexual assault, or for that matter to have convicted defendant on any of the other charges, was impermissi-

bly inconsistent with the charge on which it convicted, rendering the latter without sufficient evidence in the record.

## II.

■ Inconsistent verdicts are accepted in our criminal justice system. *State v. Grey,* 147 *N.J.* 4, 11, 685 *A.*2d 923 (1996) (stating that "[i]n such cases, we should not speculate as to whether the verdicts resulted from jury lenity, compromise, or mistake not adversely affecting the defendant."). We apply that rule based on the reasons set forth initially by the United States Supreme Court in *Dunn v. United States,* 284 *U.S.* 390, 52 *S.Ct.* 189, 76 *L.Ed.* 356 (1932). In *Dunn,* the defendant was convicted of maintaining a nuisance for the sale of alcoholic beverages but acquitted of the unlawful possession and unlawful sale of alcoholic beverages charges. *Supra,* 284 *U.S.* at 391–92, 52 *S.Ct.* at 190, 76 *L.Ed.* at 358. The Court held:

> Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment. If separate indictments had been presented against the defendant for possession and for maintenance of a nuisance, and had been separately tried, the same evidence being offered in support of each, an acquittal on one could not be pleaded as *res judicata* of the other. Where the offenses are separately charged in the counts of a single indictment the same rule must hold. As was said in *Steckler v. United States,* 7 *F.*(2d) 59, 60 [ (2nd Cir.1925) ]:
>
> > "The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as not more than their assumption of a power which they had no right to exercise, but to which they were disposed through lenity."
>
> [*Id.* at 393, 52 *S.Ct.* at 190, 76 *L.Ed.* at 358–59 (some citations omitted).]

*United States v. Powell,* 469 *U.S.* 57, 105 *S.Ct.* 471, 83 *L.Ed.*2d 461 (1984), reaffirmed that inconsistent verdicts are acceptable and non-reviewable. In *Powell,* the defendant was convicted of using a telephone to commit and facilitate conspiracy to possess cocaine with intent to distribute and possession of cocaine with intent to distribute, but was acquitted of the conspiracy and possession charges. *Supra,* 469 *U.S.* at 60, 105 *S.Ct.* at 474, 83

*L.Ed.*2d at 465. The Court cited the above-quoted passage from *Dunn* and embellished its inconsistent-verdict rule that,

> embodies a prudent acknowledgement of a number of factors.... [I]nconsistent verdicts—even verdicts that acquit on a predicate offense while convicting on the compound offense—should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.
>
> [*Id.* at 65, 105 *S.Ct.* at 476, 83 *L.Ed.*2d at 468.]

The Court rejected "as imprudent and unworkable [ ] ... allow[ing] criminal defendants to challenge inconsistent verdicts on the grounds that in their case the verdict was not the product of lenity, but of some error that worked against them" and, further, abandoned that portion of its previous reasoning, in *Dunn,* that was based on a *res judicata* analysis. *Id.* at 64, 66, 105 *S.Ct.* at 476, 477, 83 *L.Ed.*2d at 468, 469. Further, *Powell* distinguished an insufficient evidence review from an inconsistent verdicts challenge.

> Sufficiency-of-the-evidence review involves assessment by the courts of whether the evidence adduced at trial could support any reasonable doubt. This review should be independent of the jury's determination that evidence on another count was insufficient. The Government must convince the jury with its proof, and must also satisfy the courts that given this proof the jury could rationally have reached a verdict of guilt beyond a reasonable doubt.
>
> [*Id.* at 67, 105 *S.Ct.* at 478, 83 *L.Ed.*2d at 470. (internal citations omitted).]

To the extent that restatement is required, *see State v. Grey, supra,* 147 *N.J.* at 11, 685 *A.*2d 923, the *Dunn/Powell* rule controls inconsistent verdicts in this State. An inconsistent verdict may be the product of jury nullification. We permit inconsistent verdicts to be returned by a jury because it is beyond our power to prevent them. *State v. Ragland,* 105 *N.J.* 189, 204–05, 519 *A.*2d 1361 (1986) (acknowledging jury's nullification power that exists "by virtue of the finding of a verdict of acquittal"); *see also State v. Hunt,* 115 *N.J.* 330, 400–01, 558 *A.*2d 1259 (1989) (Handler, J., dissenting) (noting that jury nullification is not subject to review or to reversal). We do not speculate why a jury acquits. We accept inconsistent verdicts—and not only when the jury's

action benefits a defendant. Such verdicts are permitted "normally ... 'so long as the evidence was sufficient to establish guilt on the substantive offense beyond a reasonable doubt.' " *State v. Petties,* 139 *N.J.* 310, 319, 654 *A.2d* 979 (1995) (quoting *State v. Kamienski,* 254 *N.J.Super.* 75, 95, 603 *A.2d* 78 (App.Div.), *certif. denied* 130 *N.J.* 18, 611 *A.2d* 656 (1992)); *see also State v. Ingenito,* 87 *N.J.* 204, 211–12, 432 *A.2d* 912 (1981) (accepting, before *Powell,* "inconsistent verdicts that accrue to the benefit of a defendant").

■ That said, the return of an "inconsistent verdict" may not insulate a conviction from reversal based on other defects in the criminal proceeding. In *Grey, supra,* this Court reversed the defendant's felony murder convictions not because the jury returned inconsistent verdicts, but, rather, because our decision was "about a misleading charge that led to a verdict not permitted under our law.... The *Dunn/Powell* rule does not sanitize other trial errors." 147 *N.J.* at 17, 685 *A.2d* 923. In sum, a claim of inconsistent verdicts will not invalidate a conviction. Inconsistent verdicts—just like consistent verdicts—may be vulnerable, however, when an incomplete or misleading jury instruction causes an unfair trial.

Such an example may be found in *State v. Jenkins,*[2] 234 *N.J.Super.* 311, 313, 560 *A.2d* 1240 (App.Div.1989), in which the Appellate Division reversed and remanded for a new trial, reasoning that the jury had not been instructed on the specific unlawful purposes suggested by the evidence and that the instruction failed to inform the jury that it could not convict based on its own notions of unlawfulness or an undescribed purpose. We underscored the correctness of the *Jenkins* holding in *Petties, supra,* in which we explained that because Jenkins was acquitted of aggra-

---

[2] In *Jenkins* the facts asserted by each of the parties differed dramatically. The defendant was convicted of possession of a handgun without a permit and possession of a firearm with the purpose to use it unlawfully against another person; the defendant was acquitted of aggravated assault but convicted of simple assault, a lesser-included offense. *Jenkins, supra,* 234 *N.J.Super.* at 313, 560 *A.2d* 1240.

vated assault with a weapon, "and no evidence other than the account of the alleged assault [wa]s adduced to prove a charge of possession of the weapon for an unlawful purpose," the jury could not "convict on the possession charge because it [wa]s left to speculate on the unlawful purpose." *Petties, supra*, 139 *N.J.* at 314, 654 *A.*2d 979. As the *Jenkins* court properly recognized, the flaw was in the jury instruction and not that the two seemingly inconsistent verdicts were unacceptable. *Jenkins, supra*, 234 *N.J.Super.* at 315–16, 560 *A.*2d 1240. *Petties* expressly cautioned that "[t]o conclude that every acquittal of the substantive charge involving the use of a gun requires an erasure of the charge of possession for an unlawful purpose would be an overreading of *Jenkins.*" *Petties, supra*, 139 *N.J.* at 316, 654 *A.*2d 979.

### III.

#### A.

██ In this matter, that defendant was acquitted of the substantive charge of attempted aggravated sexual assault is not fatal to the conviction for possession of a weapon for an unlawful purpose. The superficial inconsistency between the two charges does not void the legitimacy of the jury's conviction. The jury may have chosen to convict on possession of a weapon for an unlawful purpose, the purpose being, as the court instructed in respect of the State's theory of the case, to confine Ms. Miles and to assault her sexually. And, yet, the jury could have determined not to convict defendant on the substantive offenses for reasons known only to the jury.

We must accept the arguably inconsistent verdicts, and decline to speculate on the reasons for the jury's determination. The only factual assessment required is to ensure that there was sufficient evidence to support the charge for which defendant was convicted. We find sufficient support in the record for that conviction.

██ Defendant was convicted of possession of a weapon for an unlawful purpose, contrary to *N.J.S.A.* 2C:39–4a. There are four

elements to that offense: (1) the object possessed was a firearm; (2) defendant possessed it; (3) the purpose of the possession was to use the firearm against another's property or person; and (4) defendant intended to use it in a manner that was unlawful. *State v. Brims*, 168 *N.J.* 297, 303, 774 *A.*2d 441 (2001) (quoting *State v. Diaz*, 144 *N.J.* 628, 635, 677 *A.*2d 1120 (1996)). Defendant does not deny he produced a BB gun, establishing the first and second elements. As to the remaining elements, a jury could believe that defendant had the unlawful purpose that was charged here based on the victim's testimony. She testified that shortly after entering defendant's apartment, he went into the bedroom, returned with a handgun and pointed it toward her. She also testified that defendant stated, "[n]obody knows who you're with and no one knows where you are, no one will find you," and that "he was going to f—k me and he pointed the gun at me and he told me that I wasn't going anywhere and that I was going to love it and in the morning ... we were going to have eggs." If the jury believed her testimony, the third and fourth elements are satisfied and, so, the conviction rests on a sufficient evidential base.

The State alternatively contends that the verdicts here are not inherently inconsistent. Although we have concluded that they need not be consistent for defendant's conviction to be upheld, we note that there is merit to that position. The jury did not have to believe all of the victim's testimony, and may have found some aspects of defendant's story more credible. Defendant's acquittal of aggravated assault with a firearm, contrary to *N.J.S.A.* 2C:12–1b(4), attempted aggravated sexual assault, contrary to *N.J.S.A.* 2C:5–1, 2C:14–2a(4), and kidnapping, contrary to *N.J.S.A.* 2C:13–1b(1), may be due to the jury's disinclination to accept Miles's story in its entirety. Specifically, the jury could have been convinced of only the status crime of unlawful possession and not been persuaded that the commission of the crime of aggravated sexual assault had been pressed to the stage of an attempt. *See State v. Brims, supra*, 168 *N.J.* at 303–04, 774 *A.*2d 441. Nonetheless, we simply need not engage in such a parsing of the evidence.

## B.

Thus, even though the jury may have accepted some of Miles's testimony about defendant's expressed intention to have sexual relations with her while he possessed his BB gun in her presence, the jury may have not believed entirely her version about how the evening unfolded. Alternatively, it may have rendered a compromise verdict. The verdict is explainable also on the basis of lenity. Regardless of which of the ways noted, we conclude that the record contains sufficient evidence from the witnesses, even if their stories were not accepted in full, to support the unlawful purpose charge on which defendant was found guilty.

We hold that it was error, therefore, for the trial judge and the Appellate Division to have reversed the jury's conviction based on lack of sufficiency of the evidence. We note further that the question of the adequacy of the jury instruction on the unlawful possession charge was not raised by the State in its appeal of the trial court's grant of a new trial. Defendant did not appeal his grant of a new trial. Thus, the instruction on the charge of possession of a weapon for an unlawful purpose was not before the Appellate Division. *R.* 2:3–4(a). Were we to consider the instruction given by the trial court on the unlawful purpose charge, we would find it to pass muster.[3] *State v. Villar,* 150 *N.J.* 503, 511, 696 *A.*2d 674 (1997). It followed the model charge and was case-specific.

## IV.

The judgment of the Appellate Division is reversed and the matter is remanded to the Law Division for further proceedings consistent with this opinion.

---

[3] We add that defendant argued at every level that he was denied his right to confrontation due to the physical layout of the trial courtroom that denied him access to sidebar participation, or alternatively to hear what was being said at sidebar. This argument is not ripe before us, having not yet been decided by the trial court.

Justice WALLACE, concurring.

I concur with the Court's analysis regarding our jurisprudence that inconsistent verdicts should stand when the evidence is sufficient to support a conviction of the substantive offense. *State v. Grey*, 147 *N.J.* 4, 10, 11, 685 *A*.2d 923 (1996).

I write separately to discuss an issue that is not properly raised before us, but may have contributed to the inconsistent verdicts. The misgiving I have concerns the failure of the trial court to fully respond to the jury's question concerning the unlawful possession count.

Preliminarily, I agree that the trial court properly charged the jury on the elements the State must prove for the jury to find defendant guilty on the count of possession of a firearm for an unlawful purpose. The majority opinion sets forth the charge as related to that count. The trial court clearly explained the State's claim that defendant's unlawful purpose in possessing the firearm was to "unlawfully confine Carmen Miles with the purpose to commit the crime of aggravated sexual assault upon Carmen Miles."

During deliberations, however, one of the notes the jury sent to the court stated:

> It is our reading of the counts that if a guilty verdict is found in Count 4 [possession of the B.B. gun for an unlawful purpose] a guilty verdict must also be found on either aggravated sexual assault or kidnapping. We believe that specifically the fourth element states: In this case the State contends that the defendant's unlawful purpose in possessing the firearms was to unlawfully confine Miles for the purpose to commit the crime of aggravated sexual assault on Miles.

After conferring with counsel, the trial court merely reminded the jury of its obligation to consider each offense separately and to render a verdict as to each count. The foreperson indicated, however, that the court's statements were not responsive to the jury's concern, and the following colloquy ensued:

Court: Well, perhaps it may be helpful, you must render a verdict as to each count individually.

Foreman: Somewhat. I don't know if we're allowed to articulate our concern.

Court: Why don't you do this? Keeping in mind each count is a separate offense and you have to render your verdict as to each charge. If you have a further question, let me know.

In my view, in response to the foreman's comment about articulating the jury's concern, the trial court should have instructed the foreman to present that concern in writing. It is evident that the foreman's response, after the trial court attempted to answer the jury's question without knowing what troubled the jury, demonstrated that the jury was still confused.

More importantly, because the jury's note conveyed its belief that it must decide the counts consistent with one another, the trial court's reply that the jury should consider each charge separately may have inappropriately led the jury to believe that it properly could reach inconsistent verdicts. Although after the jury has reached its verdicts, we will generally not disturb them even when they are inconsistent, during trial, the court should not inferentially or otherwise convey to the jury that it may apply lenity to reach inconsistent verdicts.

In the absence of the trial court requesting the foreperson to express his concern in writing, at the very least, the court should have informed the jury that in a criminal case, the jury cannot create its own unlawful purpose, but must decide whether the purpose alleged by the State has been proven beyond a reasonable doubt. In that vein, the court should have instructed the jury along the following lines:

It may be helpful to restate that as jurors, you may not rely on your own notions of the unlawful purpose of the defendant. Rather, you must consider whether the State has proven the unlawful purpose charged. The unlawful purpose alleged by the State was to confine Carmen Miles with the purpose to commit the crime of aggravated sexual assault upon her. I instruct you that unless you find the unlawful purpose, as the State contends, was to confine Ms. Miles for the purpose to commit the crime of aggravated sexual assault upon her, you must find defendant not guilty of that charge. If you find the State has proven beyond a reasonable doubt the unlawful purpose and each of the elements charged, you may find defendant guilty of that offense.

Chief Justice PORITZ and Justice LONG join in this concurrence.

*For reversal and remandment*—Chief Justice PORITZ and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—7.

*For concurrence*—Chief Justice PORTTZ and Justices LONG and WALLACE—3.