**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2695-18

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DAVON COOPER,

    Defendant-Appellant.

_____

Submitted March 3, 2021 – Decided April 7, 2021

Before Judges Fuentes, Whipple, and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Hudson County, Indictment No. 17-04-0267.

Joseph E. Krakora, Public Defender, attorney for appellant (Tamar Y. Lerer, Assistant Deputy Public Defender, of counsel and on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Steven Cuttonaro, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

A Hudson County Grand Jury returned an indictment against defendant Davon Cooper and co-defendant Aaron Enix, charging both men with murder, N.J.S.A. 2C:11-3(a)(1), first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a), second-degree possession of a handgun for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1), and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1).

Cooper and Enix were tried together before a petit jury. The jury found Cooper not guilty of murder and conspiracy to commit murder, and guilty of second-degree unlawful possession of a handgun and second-degree possession of a handgun for an unlawful purpose. The jury found Enix guilty of murder, unlawful possession, and unlawful use of a handgun, and acquitted both men of conspiracy to commit murder.

On Cooper's conviction of second-degree possession of a handgun for an unlawful purpose, the trial judge sentenced him to an extended term of sixteen years with eight years of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c). The judge did not impose a separate sentence on defendant's conviction for unlawful possession of a handgun. The Judgment of Conviction

dated January 28, 2019, shows the judge incorrectly merged this offense.[1]  We are thus compelled to remand this matter to the trial court for resentencing.

In this appeal, defendant argues the trial judge did not give the jury proper unanimity instructions with respect to the issue of possession of a specific firearm nor investigate alleged improprieties that occurred during jury deliberations.   After reviewing the record developed before the trial court, we discern no legal basis to disturb the jury's verdict and affirm.

I.

In his opening statement to the jury, the prosecutor said that on November 27, 2016, two Jersey City Police Officers responded to an address on Claremont Avenue to investigate a report of shots fired.  When Officers Luis Rentas and Patrick Canfield arrived at the scene, they found a man, later identified as Rashay Washington, "[l]ying in a pool of his own blood, his body riddled with bullets, steam still coming up from his body in the cold November air[.]"  When Rentas asked Washington who shot him, he responded: "Davon Cooper and Aaron Enix."  The prosecutor characterized Washington's response as "the

---

[1] Our Supreme Court has made clear that unlawful possession of a handgun under N.J.S.A. 2C:39-5(b) does not merge into possession of a firearm for an unlawful purpose under N.J.S.A. 2C:39-4(a).  State v. O'Neill, 193 N.J. 148, 163 n.8 (2007).

words of a dying man identifying his killers."

When Officer Rentas asked Washington for a second time who shot him, the victim affirmed the identity of the shooters as "Cooper and Enix." Rentas simultaneously wrote the names of the alleged shooters in his notepad. Officer Canfield, who was next to Rentas, listed Cooper and Enix in his subsequent police report as the two men Washington claimed shot him. The prosecutor then asked Rentas the following questions with respect to Washington's physical condition:

> Q. [Y]ou asked a question of Mr. Washington. What was the condition of Mr. Washington when you asked these questions?
>
> A. He was awake.
>
>      . . . .
>
> Q. Was he going in and out of consciousness at all?
>
> A. No.
>
> Q. Was he in shock?
>
> A. I'm not sure if he was in shock. I couldn't tell you. But he was awake.
>
> Q. He was awake, alert, answering questions?
>
> A. Yes, he was.
>
> Q. And you asked him who shot him?

A. Yes. I asked him.

Q. And Mr. Washington said Davon Cooper and Aaron Enix, they shot me?

A. Yes.

The medical records show Washington was shot sixteen times and died fifteen days later in the hospital. Defense counsel argues that in the course of cross-examination, the medical examiner conceded that Washington died from pneumonia caused by the surgical team turning him during surgery, in disregard of standing medical orders not to turn him under any circumstances. However, defendant did not call a forensic pathologist to support this theory of causation. Furthermore, the record shows the State's medical examiner did not waiver from his original opinion that decedent's cause of death was from multiple gunshot wounds.

Jersey City Police Department Sergeant Douglas Paretti was assigned to the "cease fire unit" as a detective at the time of the shooting. This unit was responsible for investigating "all the non-fatal shootings" that occur in Jersey City and gathering evidence to assist the Hudson County Prosecutor's Office when the cases involved fatalities. On the date and time of the shooting, Paretti responded to Claremont Avenue to canvass the scene for evidence. He testified

A-2695-18

that he recovered sixteen spent shell casings and six projectiles.

According to Officer Canfield, Washington not only identified his attackers by name, he told him that "the suspects ran south on Clerk Street." This account of Washington's statement describing the direction his assailants took immediately after the shooting was corroborated by Officer Rentas. In response, Paretti walked to Clerk Street, which was a few minutes away from Claremont Avenue. He described this area of Jersey City as a "residential neighborhood" with "lawn family homes" in a "tree-lined street." Paretti was met by two fellow police officers who told him they found two handguns in an empty lot on the south side of Clerk Street.

Officer Terrell Darby was one of the police officers who responded to the call of "shots fired" on November 27, 2016. At that time, Darby had been "on the job"[2] for only three months. Darby testified he was in a marked police van equipped with overhead lights and sirens when he heard "a call to another unit of shots fired." Although the call was not directed at him, it was the policy "to back each other up" in dangerous situations. At this point of Darby's testimony, the prosecutor plays a videorecording that shows "a van with lights and sirens

---

[2] "On the job" is a colloquialism to describe when an officer joined the force or when he or she is officially functioning in a law enforcement capacity.

A-2695-18

entering that picture." Darby identified the van as the police vehicle he was using that night, with Officer Guadalupe as the driver.

Darby explained that when he and Guadalupe arrived at the crime scene, they noticed someone was attending to the victim. Although a recent member of the police force, Darby testified that officers are "trained . . . to look beyond the scene and canvass for any possible evidence." Thus, he noticed "an unidentified male [who] pointed down Clerk Street and said two guys, burgundy[.]" Darby also noticed that Officer Rentas was pointing in the same direction. Darby testified that Guadalupe drove the police van down Clerk Street. As they approached Wilkinson Avenue, they noticed two men[3] walking in front of the school located at the intersection of Clerk Street and Wilkinson Avenue.

At this point in Darby's direct testimony, the prosecutor asked him to step down from the witness box and place an "X" on a map to indicate where defendants were located. This is narratively described on the record as "about halfway down the block." The audio record of the police transmission of "shots fired" made on 9:22 p.m., and Darby's radio transmission reporting coming into

---

[3] At the prosecutor's request, Officer Darby identified Cooper and Enix in open court and in the presence of the jury, as the two men he saw that night.

A-2695-18

contact with Cooper and Enix, established that Jersey City Police apprehended defendants within two minutes. Darby provided the following description of defendants' attire: "Aaron Enix had a burgundy top, like a sweater, and burgundy pants. And Davon Cooper had a black hat, burgundy colored top with, like, black on his shoulders, and black pants, like Adidas style." The clothing described by Darby matched the clothing worn by the assailants depicted in the video footage taken by surveillance cameras in the area of the crime scene.

Before the start of trial, the State moved to admit Washington's statement to Officer Rentas, in which he identified Cooper and Enix as the men who shot him. The State argued this was admissible as an exception to the hearsay rule under N.J.R.E. 804(b)(2), which states: "In a criminal proceeding, a statement made by a victim unavailable as a witness is admissible if it was made voluntarily and in good faith and while the declarant believed in the imminence of declarant's impending death." After considering the arguments of counsel, the trial judge granted the State's motion and explained the basis for his ruling in a comprehensive memorandum opinion. Cooper does not challenge the judge's decision to admit this evidence.[4]

---

[4] Enix challenged the admissibility of this evidence in his appeal.

A-2695-18

II.

Against this factual backdrop, defendant raises the following arguments in this appeal.

> POINT I
>
> THE FAILURE TO GIVE A SPECIFIC UNANIMITY INSTRUCTION IN REGARD TO WHICH WEAPON DEFENDANT POSSESSED NECESSITATES REVERSAL OF DEFENDANT'S CONVICTIONS.
>
> POINT II
>
> THE TRIAL COURT'S FAILURE TO CONDUCT A VOIR DIRE OF A JUROR WHO REACHED OUT TO THE COURT AND THE STATE BECAUSE HE HAD CONCERNS ABOUT THE DELIBERATIONS WAS ERROR.
>
> POINT III
>
> THE SENTENCE IS EXCESSIVE.

We begin our analysis by addressing defendant's argument attacking the viability of the jury's verdict based on the judge's failure to instruct the jurors that they needed to unanimously agree Cooper: (1) possessed one of the two handguns the police found near the crime scene; and (2) identify the specific handgun. The State agrees that the New Jersey State Constitution requires criminal convictions to be based on unanimous jury verdicts. N.J. Const. art. I,

§ 9. This bedrock principle is also codified in <u>Rule</u> 1:8–9. However, our Supreme Court has also made clear

> that courts should provide "specific unanimity" instructions—that is, impose a requirement that the jury unanimously agree on the facts underlying the guilty verdict—<u>when there is a specific request for those instructions and where there exists a danger of a fragmented verdict</u>. [Absent such request,] the failure to provide a specific unanimity instruction in the absence of such a request will not necessarily constitute reversible error.
>
> [<u>State v. Gandhi</u>, 201 N.J. 161, 192 (2010) (emphasis added).]

Thus, when a defendant asserts on appeal that the trial court should have given a particular unanimity charge, "[t]he core question is, in light of the allegations made and the statute charged, whether the instructions as a whole [posed] a genuine risk that the jury [would be] confused." <u>State v. Parker</u>, 124 N.J. 628, 638 (1991) (alterations in original) (internal quotations omitted). When confronted with this issue, appellate courts should determine "whether the acts alleged are conceptually similar or are 'contradictory or only marginally related to each other,' and whether there is a 'tangible indication of jury confusion.'" <u>Gandhi</u>, 201 N.J. at 193 (quoting <u>Parker</u>, 124 N.J. at 639). Without a reasonable basis to support a claim of confusion, the jury is presumed to have

understood the trial court's instructions. State v. Vasquez, 265 N.J. Super. 528, 547 (App. Div. 1993) (citing State v. Manley, 54 N.J. 259, 270 (1969)).

Here, Cooper was charged with two separate offenses related to the possession of a handgun. The verdict sheet asked the jury to find: (1) whether Cooper possessed "a certain weapon, that is, a handgun, with purpose to use it unlawfully against the person or property of another;" and (2) whether he "knowingly did possess a handgun, without first having obtained a permit to carry same."

The charge conference is a critically important part of the criminal trial. "Any party, at or before commencement of trial, may submit written requests that the court instruct the jury on the law as set forth in the requests. As to issues not anticipated prior to trial, any party may submit written requests before closing arguments." R 1:8-7(b). Defense counsel did not ask the trial judge to give the jury an unanimity instruction. Our standard of review is thus codified in Rule 2:10-2, which directs us to disregard any error or omission "unless it is of such a nature as to have been clearly capable of producing an unjust result[.]"

The State argues that these two handgun-related charges are cognate. The trial judge instructed the jury on the legal concepts of actual and constructive possession. As part of his summation, the prosecutor played for the jury

11

surveillance footage of the shooting that showed the clothes the assailants wore at the time they shot Washington.  The prosecutor asked the jury to notice the similarities between the clothing worn by one of the assailants and Cooper's attire at the time he was arrested.  The prosecutor urged the jurors to

> [f]ollow the evidence, ladies and gentlemen, follow the evidence. This is what Davon Cooper was wearing when he was arrested, a North Face bubble jacket, exactly as you see.
>
> And what was he wearing underneath?  The hood.  The video, the clothing, it speaks for itself.  This is not coincidence, ladies and gentlemen, this is evidence, evidence of guilt.
>
> And look at what he's doing at this particular moment. He's taking something out of his right pocket. I'll argue to you it has the shape and characteristics of a gun. Maybe they were thinking about it, but maybe he was thinking at this moment, maybe I'll throw it out there. But then they noticed just two houses down and empty field, and that seemed like a better place to dump a gun, which is exactly what they did.

The jury was free to accept or reject the prosecutor's characterization of what was depicted in the video.  However, it is entirely plausible to infer from this evidence that Cooper possessed one of the handguns recovered by the police near the crime scene.  There is no factual or legal basis to conclude that the absence of an unanimity charge under these circumstances was clearly capable of producing an unjust result.  R. 2:10-2.  Additionally, the fact that Cooper was

12

acquitted of murder and conspiracy to commit murder and convicted of the possession of handgun charges is not indicative of jury confusion. "Each count in an indictment is regarded as if it was a separate indictment." State v. Banko, 182 N.J. 44, 53 (2004) (quoting Dunn v. United States, 284 U.S. 390, 393 (1932)).

We will next briefly consider the post-conviction event that Cooper argues revealed a specter of impropriety over the jury's deliberations that warranted a more thorough investigation than the one conducted by the trial judge. The record shows that the matter came to light days after the trial ended, when one of the deliberating jurors telephoned the trial judge's chambers and the office of the attorney who represented Enix. The trial judge provided the following account of what occurred on the record:

> After the jury reached a verdict [on Thursday], the following Monday, . . . when I came in that day, I was told my chambers had received a call from an individual who identified himself as our Juror Number 14. During the trial that was one of the deliberating jurors.
>
> [He] indicated to my secretary that he wanted to speak to me. He was not happy with the verdict the jury had rendered and wanted to know what to do about it.
>
> I didn't take any action at that time, because obviously I was not going to engage in an ex parte conversation with the juror.

> Before I even had the opportunity to reach out to counsel, I believe [Enix's counsel] contacted my chambers indicating he had also received . . . a phone call from the individual identifying himself as Juror Number 14[.]
>
> . . . .
>
> So, I say that, because I want the record to be clear that I don't in any way believe [Enix's counsel] did anything wrong by taking the phone call that came into his office, because the person had initially identified himself by his name, not any involvement in the trial.

Enix's trial counsel also made clear for the record that his interaction with Juror 14 was both brief and short on details. Counsel stated he initially believed the caller was someone who had read about the case in the newspaper and was upset with the outcome of the trial because he said "I don't agree with the verdict" several times. According to Enix's counsel:

> I inquired as to well, who are you, and he indicated that he was Juror Number 14, the only African American juror. I don't even remember if even he gave me his name on the phone.
>
> Then he basically went through just a dissertation of what took place in the jury room,[5] and at that point I

---

[5] Later in the course of this impromptu hearing, Enix's counsel elaborated on this statement. He said Juror 14 told him "one juror was pregnant, and another juror had poison ivy . . . [and again] said he was dissatisfied." According to Enix's counsel, he asked Juror 14: "why did you say guilty when you stood up? And he said, well, that's what I felt at the time."

A-2695-18

> immediately stopped him, and said you need to contact [the trial judge's] chambers, and that was essentially the conversation, maybe a thirty second conversation.

Enix's counsel stated for the record that he immediately telephoned the prosecutor and the attorney who represented Cooper and relayed to them the substance of the conversation he had with Juror 14. At this point, the trial judge asked the attorneys: "Is there anyone asking me to take any remedy?" The prosecutor stated for the record that he accepted the veracity of Enix's counsel's account of what was said during his brief telephone conversation with Juror 14 and did not see any factual or legal basis to take any action. Cooper's counsel did not make any statement.

The trial judge began his analysis by citing Rule 1:16-1, which states: "Except by leave of court granted on good cause shown, no attorney or party shall directly, or through any investigator or other person acting for the attorney, interview, examine, or question any grand or petit juror with respect to any matter relating to the case." The judge concluded there was no legal or factual basis to call back and interview this juror about the deliberative process in this case. We agree.

This court has long recognized the strong public interest underpinning the need to protect the confidentiality of the jury's deliberative process. State v.

A-2695-18

Young, 181 N.J. Super. 463, 468 (App. Div. 1981). Protecting the jury's deliberative process during and after the trial is an indispensable part of creating an environment that allows individual jurors to express their views of the evidence freely and without fear of retribution. As noted by the late Chief Justice Weintraub: "A jury deliberates in secrecy to encourage each juror to state his thoughts, good and bad, so that they may be talked out." State v. LaFera, 42 N.J. 97, 106 (1964). Recalling a juror for a post-verdict voir dire is an "extraordinary procedure" that should be invoked only when good cause is shown. State v. Athorn, 46 N.J. 247, 250 (1966); see also R. 1:16-1. The trial judge correctly concluded that the evidence presented did not meet this standard.

Finally, we address defendant's argument concerning the length of the sentence imposed by the trial court. As we noted at the start of this opinion, the trial judge sentenced Cooper to an extended term of sixteen years with eight years of parole ineligibility pursuant to the Graves Act, N.J.S.A. 2C:43-6(c), on his conviction for second-degree possession of a handgun for an unlawful purpose. N.J.S.A. 2C:39-4(a)(1). The judge thereafter merged defendant's conviction of second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b)(1). This constituted an illegal sentence.

As our Supreme Court explained in State v. Garcia, the doctrine of merger codified in N.J.S.A. 2C:1-8(a) does not apply here because unlawful possession of a firearm under N.J.S.A. 2C:39-5(b) "involves a distinct factual element failure to obtain a permit to carry a firearm." 195 N.J. 192, 200 n.4 (2008). Stated differently, "the gravamen of unlawful possession of a handgun is possessing it without a permit[.]" State v. Deluca, 325 N.J. Super. 376, 392-93 (App. Div. 1999). This offense thus stands alone for sentencing purposes "and does not merge with a conviction for a substantive offense committed with the weapon." Ibid.

The State concedes in its appellate brief that "at the State's improvident urging, the judge improperly merged defendant's conviction for possession of a weapon without a permit with his conviction for possession of a weapon for an unlawful purpose." Although the State otherwise fervently defends the sentence imposed by the trial court, the court's misapplication of the doctrine of merger here renders this sentence legally untenable. The trial judge must resentence Cooper de novo and determine the term to impose on each separate offense.

To assist the trial court in this respect, we will also address the other arguments Cooper raised related to the sentence. Cooper argues the court: (1) misconstrued the applicable range for the imposition of an extended term; (2)

17

improperly considered arrests and other matters that did not result in a conviction to support finding aggravated factor N.J.S.A. 2C:44-1(a)(6); (3) abused its discretion when it granted the State's motion to impose a discretionary extended term pursuant to N.J.S.A. 2C:44-3(a); and (4) did not articulate a basis for imposing the longest permissible parole disqualifier under the Graves Act, N.J.S.A. 2C:43-6(c).

Our standard of review to determine the validity of a sentence imposed by the trial court is well-settled. We review the record developed at the sentencing hearing and the explanation the judge gave in support of this particular sentence. State v. Case, 220 N.J. 49, 65 (2014). We also determine whether the record contains credible evidence to support the applicability of the particular aggravating and mitigating factors the judge found relevant in this case. State v. Roth, 95 N.J. 334, 363-64 (1984); N.J.S.A. 2C:44-1. Stated differently, we must determine "whether, on the basis of the evidence, no reasonable sentencing court could have imposed the sentence under review." State v. Ghertler, 114 N.J. 383, 388 (1989).

Cooper was twenty-three years old when he committed these two handgun-possession offenses on November 27, 2016. He was less than three weeks from his twenty-sixth birthday when he stood before the trial judge for

18

sentencing on January 11, 2019. The judge found he had three prior serious indictable convictions; all of his criminal transgressions, including the two handgun convictions in this case, occurred in Hudson County.

He was eighteen years old when he committed his first criminal offense on November 4, 2011. He was convicted of second-degree unlawful possession of a handgun and sentenced to a term of five years, with one year of parole ineligibility. On May 8, 2018, the court sentenced Cooper on two pending offenses. The first involved second-degree robbery under Indictment 15-2-212,[6] for which the court sentenced him to a term of six years, with an eighty-five percent period of parole ineligibility and three years of parole supervision pursuant to the No Early Release Act, N.J.S.A. 2C:43-7.2. On this same date, the court sentenced him under Accusation 15-9-478 to a term of six years flat

---

[6] Although the judge did not identify the degree of the robbery offense as codified in N.J.S.A. 2C:15-1, we infer it was a second-degree robbery from the term of imprisonment imposed by the court. See N.J.S.A. 2C:43-6(a)(2), empowering the court to impose a term imprisonment between five to ten years for a crime of the second-degree. Furthermore, the New Jersey Department of Corrections (NJDOC) website indicates Cooper committed this robbery on August 3, 2014. Offender Search Form, State of New Jersey Dep't of Corr., https://www20.state.nj.us/DOC_Inmate/inmatesearch (accept disclaimer; then search for SBI Number "000156845E").

for second-degree eluding,[7] N.J.S.A. 2C:29-2(b).  The judge ordered that these two sentences run concurrently to the six-year term imposed on the second-degree robbery.

Against this backdrop, the judge found sufficient evidence to support the following aggravating factors under N.J.S.A. 2C:44-1(a): (3), the likelihood that Cooper may commit another offense; (6), his prior criminal record and the seriousness of these convictions; and (9), the need for specific and general deterrence.  The judge noted "that this now represents his fourth indictable conviction of offenses that occurred before he had attained the age of twenty-four."  With respect to lesser non-indictable offenses, the judge found:

> He has in 2014 and 2015 municipal ordinance violations in the Jersey City Municipal Court. In 2014, he was arrested on the robbery charge.  In 2015, he was arrested on the eluding charge.  In 2016, he was arrested on a drug paraphernalia charge and sentenced in the Jersey City Municipal Court.  In 2016, he was arrested on the instant case and in 2017 while in custody, he was charged with assaulting a law enforcement officer, and pled guilty to a simple assault.  So, he assaulted [an] officer while he was in custody.
>
> . . . .

---

[7] Although the judge did not identify the offense or degree, the NJDOC website indicates that Cooper committed second-degree eluding on May 4, 2015. Offender Search Form, State of New Jersey Dep't of Corr., https://www20.state.nj.us/DOC_Inmate/inmatesearch (accept disclaimer; then search for SBI Number "000156845E").

There's an overwhelming need to deter Mr. Cooper as well as others. There's simply no reason for him to be running the streets carrying a gun, and he's just not carrying a gun. I think we have to keep in mind that the [j]ury convicted him for possessing that weapon for an unlawful purpose.

Cooper notes that the judge's findings did not end here. He argues the judge impermissibly considered arrests that did not result in further prosecution when weighing the aggravating factors. The State argues that a judge at sentencing may view "other aspects of [a] defendant's record." State v. Dunbar 108 N.J. 80, 92 (1987). Here, the judge noted Cooper "was . . . in the juvenile justice system at the age of [fifteen] and received a deferred disposition. Then less than three years later, he was arrested . . . [on a] gun possession charge . . . was arrested again in 2011 and that matter was dismissed." The judge used these relatively minor interactions with the juvenile justice system as a harbinger of the criminal behavior Cooper would exhibit once he reached adulthood. The record shows the judge used this line of reasoning to support finding aggravating factor N.J.S.A. 2C:44-1(a)(3). According to the judge, Cooper's "pattern is very clear to me. He is certainly someone who does not appreciate the need for a secure society and continues to violate the law."

A-2695-18

Our Supreme Court has made clear that "when no such undisputed facts exist or findings are made, prior dismissed charges may not be considered for any purpose." State v. K.S., 220 N.J. 190, 199 (2015) (emphasis added). The judge's comments and consideration of Cooper's minor interactions with the Juvenile Justice System as well as any adult charges that did not result in a conviction was indisputably improper. However, when viewed in the context of Cooper's record of violent criminal convictions that occurred in a relatively short period of time, the judge's finding of aggravated factor N.J.S.A. 2C:44-1(a)(3) remains well-supported by competent evidence in the record. Cooper's remaining arguments attacking the viability of the sentence lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).

The jury's verdict finding Cooper guilty of second-degree unlawful possession of a handgun and second-degree possession of a handgun for an unlawful purpose is affirmed. However, as the State concedes, the trial judge improperly merged these two separate convictions and imposed a single extended term sentence on second-degree possession of a handgun for an unlawful purpose. This is an illegal sentence. We thus remand the matter to the trial court to resentence Cooper anew taking into considerations the comments and analysis we have included in this opinion.

Affirmed in part, reversed in part, and remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2695-18