# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3302-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

M.A.B.,[1]

     Defendant-Appellant.

_____

Submitted September 23, 2025 – Decided November 17, 2025

Before Judges Gooden Brown and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Indictment No. 22-12-2215.

Hegge & Confusione, LLC, attorneys for appellant (Michael Confusione, of counsel and on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Laura E. Wojcik, Deputy Attorney General, of counsel and on the brief).

---

[1] We use initials to protect the identity of victims of domestic violence. R. 1:38-3(c)(12).

PER CURIAM

Defendant M.A.B. was charged in a two-count indictment with possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a)(1) (count one); and terroristic threats, N.J.S.A. 2C:12-3(a) (count two). The charges stemmed from a verbal altercation during which he brandished a handgun at his housemate, S.L. When police responded to defendant's residence after S.L. reported the incident, defendant initially stated he owned firearms in another state but had none in New Jersey. However, after a consent search of his bedroom revealed ammunition and other gun-related paraphernalia, defendant admitted to having guns at the house and to having one in his hand during his altercation with S.L. The guns were seized after defendant showed the officers where the guns were buried in the backyard.

Pre-trial, defendant filed motions to suppress the guns seized without a warrant and to suppress his statements to police without Miranda[2] warnings. Both motions were denied. Defendant's in limine motion to admit evidence of S.L.'s alleged prior false accusations against other family members was also denied. Following a jury trial, defendant was convicted of the gun possession

---

[2] Miranda v. Arizona, 384 U.S. 436 (1966).

A-3302-22

charge and acquitted of terroristic threats. He was convicted of harassment, N.J.S.A. 2C:33-4(c), as a lesser included offense of terroristic threats. Defendant was subsequently sentenced to an aggregate term of five years in prison, with a forty-two-month period of parole ineligibility, pursuant to the Graves Act, N.J.S.A. 2C:43-6(c).

On appeal, defendant raises the following Points for our consideration:

POINT [I]

THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION TO SUPPRESS HIS STATEMENTS AND THE FIREARM SEIZED

    A.    The Trial Court Erred In Ruling That The Police's Initial Entry Into The Home Was Valid Based On Consent

    B.    The Trial Court Erred In Ruling That Valid Consent Was Given To Search Defendant's Bedroom And The Backyard

    C.    The Court Erred In Ruling That The Police "Would Have Inevitably Discovered The Guns"

    D.    The Court Erred In Denying Defendant's Motion To Suppress His Oral Statements To The Police Officers

POINT [II]

THE TRIAL COURT ERRED BY DENYING DEFENDANT'S MOTION IN LIMINE TO ADMIT A PRIOR FALSE ALLEGATION BY THE VICTIM

POINT [III]

DEFENDANT'S ACQUITTAL OF THE CRIME OF TERRORISTIC THREATS NEGATED AN ESSENTIAL ELEMENT OF THE POSSESSION OF A WEAPON FOR AN UNLAWFUL PURPOSE CRIME, BECAUSE THE UNLAWFUL PURPOSE ALLEGED FOR THE WEAPONS CHARGE WAS TO TERRORIZE THE VICTIM – WHICH THE JURY FOUND DEFENDANT NOT GUILTY OF

POINT [IV]

DEFENDANT'S SENTENCE IS IMPROPER AND EXCESSIVE.

Based on our review of the record and the applicable legal principles, we affirm.

I.

The trial was conducted over three days, from March 22 to 24, 2023. The State produced five witnesses: three law enforcement officers, a firearms expert, and S.L. Defendant and his father, F.B., testified for the defense. We glean these facts from the trial record.

In July 2019, both defendant and S.L. were living with F.B. at his house in Manchester. F.B. is S.L.'s step-grandfather through his marriage to M.B., S.L.'s grandmother who since passed away. F.B. and M.B. had custody of S.L.

twice during her childhood. After S.L. graduated from high school, she lived with F.B. and M.B. "on and off." She had recently given birth to a baby girl and began splitting her time between F.B.'s house and the baby's father's house.

Defendant previously lived in North Carolina with his mother. After F.B. was in a coma for over two weeks, defendant began driving up from North Carolina to visit him. Eventually, at F.B.'s request, defendant moved into F.B.'s house to help care for him, bringing his three husky dogs to join F.B.'s two labradors.

At around 10:30 p.m. on July 23, 2019, S.L. arrived home with her daughter. After putting her daughter to bed, S.L. came into the living room, where defendant and F.B. were sitting, and told them that the baby's doctor believed the child might be allergic to dog dander. The two men disagreed with the diagnosis and an argument ensued between them and S.L., with F.B. commenting that the baby had been around his dogs since she was born. The argument escalated, and eventually defendant told S.L. that if she had "such a problem" with the dogs, she should "get the fuck out."

Believing she had been "kicked out" and "was not coming back," S.L. quickly "grabbed whatever [she] could carry." S.L. testified that at one point while she was packing up, defendant told her that if she did not "stop slamming

5

shit," he would "follow [her] out and pop [her] tires." She admitted that because her arms were full with her daughter and "all of [her] bags," she pulled "hard" on the front door with her foot to close it behind her as she left.

S.L. testified that while she was loading her car outside, she heard the front door of the house open and a clicking noise she did not immediately recognize. Because of his threat to damage her tires, S.L. thought it might be defendant flipping open a folding knife. As she secured her daughter inside the car, defendant approached S.L. holding a black and silver handgun. Defendant told her, "[i]f you want to roll out of here on all fours, respect the motherfucking house." S.L. explained defendant was less than four feet away and did not point the gun "directly" at her or the baby but gestured with it toward her car and the house while he spoke.

Once S.L. saw the gun, she "angled [her]self between" defendant and her daughter "to . . . shield her" in case defendant used it. After S.L. finished strapping her daughter into the car and got into the driver's seat to leave, defendant said, "I don't give a fuck if you're a mother or not." S.L. testified that during the incident, she was "[s]cared and unsure of what was possibly going to happen." She was "shaking" and felt the threat from defendant was "real." S.L. called 9-1-1 as she drove away and was told to go to the Manchester Police

6

Station.  Once there, she filed a domestic violence complaint against defendant. After the incident, S.L. never returned to F.B.'s house.

Following S.L.'s report, Sergeant Theodore Cooke and Officers Thomas Chant, Keith Douglas, and Vincent DeRome III responded to the residence at around 12:20 a.m. the morning of July 24, 2019.  They were not wearing body cameras, but had portable microphones that recorded audio to the motor vehicle recorder (MVR) inside their patrol cars.  Chant testified at trial and the MVR from his microphone was played for the jury.

Chant said the officers went to the house to "follow up on" S.L.'s report of an argument during which she was "threatened with a firearm."  A "firearms check[]" revealed there were "no registered firearms" associated with anyone living in F.B.'s house.  Defendant answered the officers' knock on the front door and invited them inside when Cooke asked if they could "step in and speak to [him]."  To avoid disturbing F.B., who was sleeping on a couch in the living room, defendant asked the officers to accompany him downstairs to his bedroom located in the basement of the house.  Chant testified defendant's demeanor was "calm," "cordial," and "cooperative."

Once downstairs, Chant asked defendant about the argument earlier that night, saying the police "got one side of a story" and wanted to "get

[defendant's]." Defendant replied that he, F.B., and S.L. quarreled about whether S.L.'s baby was allergic to his dogs, and he told S.L. she should move out if she was "trying to make all kinds of issues." He said S.L. "started getting aggressive" and was "slamming doors." He reported that S.L. made multiple trips in and out of the house with her belongings, and because she was being loud, he "said, 'hey, look, don't slam that fucking door or I'm gonna come out there.'"

Defendant told the officers that after S.L. slammed the front door "harder than hell," he stood outside watching her load up her car and told her, "you better leave here calmly or it's not gonna be so nice next time." When Chant asked if he said anything else to S.L., defendant admitted that he threatened to "flatten all four of her tires," but denied that he "threatened her or her baby or anything like that." Defendant said he made the threat about the tires "just to get the point across."

When asked, defendant repeatedly denied to the officers that a gun was involved in the incident or that there were any guns at F.B.'s house. Defendant admitted he owned two guns but stated they were at his home in North Carolina. He added that he had taken a gun training course and had a North Carolina concealed carry permit. When Chant asked why S.L. would think defendant had

a gun, defendant responded, "[s]he knows I own guns but they're not here." He added that S.L. "lies a lot about everything" and had been "a headache" to him since he moved in.

At that point, Cooke asked defendant for consent to "check [his] room" and "make sure there[ was] nothing in [t]here." Chant explained that the officers wanted to conduct a search "just to verify that there were no firearms present," despite defendant's denial. Initially, defendant said he did not "have a problem" consenting but "it[ was his] dad's house." After Cooke assured defendant that he had "control over" his bedroom and that the officers would ask F.B. for consent to search the rest of the house, defendant gave the officers permission to search his bedroom and his vehicle.

Prior to the search, Chant read a consent-to-search form to defendant, stating that he "freely and voluntarily" allowed the officers to search his bedroom and his car. Chant informed defendant that he had the right to "refuse to give . . . consent" and could withdraw consent "any time during the search." Defendant acknowledged understanding his rights by nodding and signing the form.

During the search of defendant's bedroom, the officers found a gun lock, a gun cleaning kit, and a backpack containing ammunition and firearm

accessories. As a result of the discovery, the officers told defendant they would ask F.B. for consent to search the rest of the house. As Cooke began speaking to F.B., defendant told Chant, "I do have firearms here." When Chant asked where they were located, defendant responded, "[t]hey're in the backyard." Defendant quickly added "they're not loaded." Defendant then admitted to the officers that he "did have one in [his] hand," and "[S.L.] saw it." He explained "it was not loaded" and he had "no intention of firing." According to defendant, he just wanted to "get[] her out of the house safely, calmly."

Defendant showed the officers where the guns were located in the backyard. With defendant's assistance, the officers unearthed a black trash bag under the deck that was covered with "loosely turned over dirt." Inside the bag, they found ammunition and two guns, including a silver and black Smith and Wesson handgun that was consistent with S.L.'s description of the weapon defendant held during the incident. Police secured the firearms and arrested defendant.

Heather Dover, an expert in firearms identification and operability, testified that the Smith and Wesson handgun was operable. She demonstrated "racking" the gun to replicate for the jury the accompanying "click[ing]" sound the State claimed S.L. heard as she packed up her car. Dover explained that

"racking" a gun of this type involves "pull[ing] the slide back," which causes a round of ammunition to move into the firearm's "chamber," where it is then ready to fire at the pull of the trigger.

In his defense, defendant testified he bought his firearms legally in North Carolina and had a North Carolina concealed carry permit. He admitted he brought two guns with him for "protection" on his trips when he visited F.B. He explained that he always "locked up" his firearms in his vehicle or a bag while visiting F.B. and admitted he had previously shown the guns to S.L. and an uncle on one occasion.

Defendant claimed he was unaware of specific gun control laws in New Jersey but had heard that "the state [was] not gun friendly." He was unsure about "the process . . . to register" firearms in New Jersey, and "didn't plan to" register his guns unless "it was required." Defendant testified that when he came to live with F.B., he put the guns inside an "industrial black commercial bag" and buried them under the deck to get them "out of the way, safe" and to avoid "any legal trouble" arising from them being unregistered in New Jersey.

Defendant testified that before moving to New Jersey, he had had some disagreements with S.L. about F.B.'s medical condition. He was annoyed she had not told him F.B. was in a coma until two or three days later. After he

11

moved in with F.B., his relationship with S.L. continued to deteriorate and "there were tensions in the house." According to defendant, S.L. did not "clean[] up after herself" and came "in and out of the house at all hours of the night." Defendant also felt S.L. was "not making an effort to help" with F.B.'s care to expedite his recovery.

Defendant testified that on the day of the incident, he worked a shift as a UPS driver from 7:00 a.m. to around 7:00 or 8:00 p.m. He acknowledged that later that night, there was a "dispute" between F.B. and S.L. about whether S.L.'s daughter was allergic to dogs. Defendant agreed with his father that the baby was not allergic, because she had played with all the dogs "on multiple occasions . . . and had no[t] reported issues before that." After watching F.B. and S.L. "go[] back and forth about it for a bit," defendant "looked at [his] father and said, can I say how we're both feeling?" When F.B. nodded, defendant told S.L. they would like her to leave.

Defendant said S.L. "lost her temper and started stomping" around the house and "slamming doors" while packing up her things. He testified that she was "being very aggressive," "causing things to shake" on the walls and shelves, and breaking "[a] couple of doorknobs" on interior doors. Defendant said F.B. "yelled at her a couple of times to stop slamming things," and when S.L.

"slammed another door," defendant "made [his] comment about if you want to leave on all fours, respect the house and . . . stop slamming doors." S.L. then exited the house, slamming the front door so hard behind her that she "knocked pictures off that were hanging above . . . [it], broke the electronic keypad lock[,] . . . and cracked the . . . door frame."

At that point, defendant said he got up from his chair in the living room and "stepped out on the porch to watch, to make sure [S.L.] didn't damage anything else on her way out." Defendant testified he never left the porch or said anything further to S.L. and denied having a gun in his possession during the incident. He merely watched as S.L. finished putting her belongings into her car and drove off with her daughter before going back inside.

Afterwards, defendant "grabbed a drink[,] . . . popped a couple of sleeping pills to try to de[-]stress," and went to bed. At around midnight, he was awakened by a knock at the door and found police officers outside. After he let the officers into the house, they explained why they were there. Defendant admitted initially lying to the officers about not having any firearms at F.B.'s house. He confirmed that he told police he had threatened to flatten S.L.'s tires. Defendant also admitted that after the officers went to speak to F.B., he told

A-3302-22

them he had a gun in his possession during the incident with S.L. However, during his trial testimony, he claimed that was a lie.

Defendant explained he was trying "to diffuse the situation" and "not bother [his] father" because his father was "still suffering from a lot of [medical] issues" and he did not want his father to be "upset" by "the police or people bombarding him in the middle of the night." Defendant added that based on "the laws in North Carolina," he believed that "just possessing a weapon [was] not illegal." Defendant also said he was "mentally confused" because of the pills he had taken and was trying to "keep[] the dogs under control at the same time."

However, on cross-examination, defendant admitted that he was not "so groggy or sleepy or under the influence of sleeping pills" that he did not have "the wherewithal" to take the officers downstairs to avoid waking his father, give them specific details about the incident, or understand and sign a consent-to-search form for his bedroom. He testified that he signed the consent form because he knew police would not find his guns in that location but conceded that he lied "several" times about not having firearms at the house.

F.B. corroborated defendant's version of the incident. F.B. explained that S.L. "started this whole mess" by trying to get him to remove defendant's dogs from the house. He said defendant "calmly" told S.L. to "get out," and that S.L.

14

"stomped" around and slammed doors. According to F.B., defendant "ran out . . . and stood on the front porch to make sure . . . she didn't damage any of [his or defendant's] vehicles" as she left. F.B. swore defendant did not have a gun, and "just stood there and watched [S.L.] leave."

After the jury returned its verdict, defendant was sentenced. A conforming judgment of conviction was entered on June 2, 2023, and this appeal followed.

## II.

In Point I, defendant argues the motion judge erred by denying his motions to suppress the guns found in the backyard and his statements to police on the night of the incident. We disagree.

At the pre-trial suppression hearing, Chant was the sole witness produced by the State. His testimony was consistent with his trial testimony. Chant testified that from the time the officers arrived until the time of defendant's arrest, defendant was free to move about the house with the officers "monitoring" him, and defendant never indicated that he no longer wished to speak with the officers or wanted them to leave. Chant added that defendant was not handcuffed before he was placed under arrest.

According to Chant, after allowing the officers to enter the house to discuss the incident, defendant initially denied having firearms in the house. Eventually, defendant agreed to a consent search of his bedroom and his vehicle once Cooke assured him he had authority to consent to a search of those areas. Prior to conducting the search, Chant informed defendant he had the right to refuse the search, could withdraw consent at any time, and could stay in the vicinity while police conducted the search. Chant testified defendant acknowledged he understood each part of the consent-to-search form read to him by nodding, which was not discernible on the MVR audio recording played at the hearing. Chant confirmed defendant signed the form and was "advised to . . . be in the area where [he could] . . . observe the search and be able to withdraw [his] consent" if he wished.

Chant testified that once the ammunition and other gun-related paraphernalia were found in defendant's bedroom, corroborating S.L.'s report, the officers decided to seek F.B.'s consent to search the rest of the house. Chant explained that if consent was not given, the officers would have sought a search warrant. Chant said Cooke's statement to defendant that the police and defendant were not "going anywhere" until things were "figured out" was meant

16

to "keep everyone apprised" that given the evidence discovered during the search of defendant's bedroom, the officers would have to investigate further.

Chant testified that when the officers attempted to speak with F.B., defendant admitted he had firearms at the house and that S.L. had seen him hold a gun. Chant confirmed no officer asked defendant "any questions immediately before" he made those admissions. Chant said that after defendant admitted having firearms at the house, he asked him where they were located as "a matter of officer safety," particularly since defendant had not been "forthright up to that point." Chant testified defendant agreed to show them where the firearms were located and continued to explain to the officers "what [had] happened with the guns that evening" without being asked any further questions. Chant acknowledged they did not ask F.B. to sign a consent-to-search form before following defendant to the backyard to recover the guns.

Chant testified defendant was not arrested until after the guns were retrieved. After that point, defendant was not asked any further questions and did not volunteer any additional information. Chant said defendant's demeanor remained "cordial" even as he offered to take the officers into the backyard to show them where the guns were located. According to Chant, at one point during his interactions with the officers, defendant said he was "tired."

A-3302-22

However, Chant did not believe that any "fatigue or tiredness" "affect[ed]" defendant's "cognitive abilities" when conversing with the officers. Instead, defendant seemed fully able to understand what the officers were telling him and gave "appropriate" responses.

Chant further explained that although S.L. obtained a domestic violence temporary restraining order (TRO) against defendant about two hours later at 2:36 a.m., law enforcement did not request a search warrant for weapons pursuant to the TRO because the guns had already been seized. Chant added that a warrant would have been sought if the guns had not already been found.

Following the hearing, the judge denied defendant's motions to suppress the guns and the statements in an August 19, 2022 order. In an accompanying written opinion, the judge recited factual findings consistent with Chant's testimony, detailed the governing legal principles, and rejected each of defendant's arguments as baseless. The judge noted Chant's testimony was corroborated by the MVR audio recording.

Specifically, the judge found that the initial entry into the home was lawful because defendant gave consent to the officers entering the residence and "[l]aw enforcement officers do not need . . . to advise a defendant that he may refuse to allow entry" for the consent to be valid. The judge explained that the officers

politely asked to come inside, and defendant permitted their entry while escorting them downstairs to avoid waking F.B. The judge described defendant's exchange with Chant and Cooke on the porch as "cordial and non-coercive."

Next, the judge determined that the consent to search defendant's bedroom was valid. In support, the judge applied the factors set forth in State v. King, 44 N.J. 346, 352-53 (1965), and concluded that based on the totality of the circumstances, defendant's consent was not coerced but was "knowing[ly]" and "voluntar[ily]" given. The judge acknowledged that the fact that consent was obtained before defendant made incriminating admissions and after defendant "questioned whether he had authority to consent to search his bedroom" "militate[d] in favor of a finding of coercion."

Nonetheless, the judge found that five of the King factors "weigh[ed] in favor of voluntary consent," namely: (1) that defendant was not under arrest when he gave consent; (2) that "police did not seize any contraband [from] the search of the bedroom"; (3) that defendant "knew that the officers would not find the firearms in his bedroom[] because he had buried them in the yard"; (4) that "defendant was not handcuffed when he gave consent"; and (5) that although defendant "did not affirmatively assist the . . . officers in a physical manner, he

told them about the existence of mice in the room and had cordial conversation with them during the search."

Likewise, the judge determined that the search of the backyard was conducted pursuant to valid consent. In that regard, the judge found "the officers reasonably believed" defendant "had authority over the items seized because they were his weapons," and had authority to consent to the search of the backyard because it was a common area. The judge reasoned:

> Both defendant and his dogs had access to the backyard, and they did in fact go into the backyard, which indicated that the backyard was a common area of the residence. Moreover, [F.B.] was present and did not object when . . . defendant led the officers to the backyard. Although [F.B.] owned the residence and . . . defendant's living quarters were located downstairs, the officers reasonably believed that he had the authority to consent to search the backyard because it was a shared area of the residence. The court also notes that the officers did not conduct a random search of the backyard, rather, . . . defendant led them straight to the hole he had dug to bury the weapons, and Officer Chant dug up that particular area only to retrieve the weapons.

The judge rejected defendant's contention that the officers were required to obtain "a second [consent-to-search] form from him" prior to searching the backyard, explaining that "it was not practical" and the "omission [did] not render the consent search of the backyard unconstitutional." In support, the judge pointed to "the dangerous nature of the items seized and the fact that . . .

20

defendant had already been advised of his right to refuse to permit a search and signed a form."

The judge found further that even if the officers were required to obtain a second consent to search, the inevitable discovery doctrine applied and law enforcement "would have inevitably discovered the guns under this exception." The judge expounded:

> First, upon defendant's spontaneous admission that he had guns in the house, there is no doubt that Officer Chant acted reasonably in asking him where the guns were. This was an unquestionable issue of officer safety and was entirely appropriate. . . . [D]efendant then stated that they were in the backyard. Had the officers stopped all interaction with both [defendant and F.B.] at that point, secured them[,] and sought a telephonic search warrant, there was probable cause to issue the warrant and the officers would have found the guns in the backyard.

The judge also found that alternatively, the municipal court judge who issued the TRO to S.L. "could have, and likely would have, issued a search warrant for the weapons based on the victim's allegations," and did not do so only because "by the time the TRO was issued," the weapons had "already been seized." Lastly, the judge observed that defendant was also ordered in the TRO to "surrender" any weapons he owned to law enforcement.

A-3302-22

Next, the judge turned to defendant's statements. "[V]iewing the totality of the circumstances from the perspective of a reasonable person in . . . defendant's position," the judge determined "his treatment was not the functional equivalent of a formal arrest and therefore Miranda warnings were not required." The judge also found that "the officers did not ask any questions that were 'reasonably likely to elicit an incriminating response' from . . . defendant such that he was under interrogation."

In support, the judge elaborated that after the discovery of the gun-related paraphernalia in defendant's bedroom, Cooke's statement that no one was "going anywhere" until the situation was "figured out" had to "be considered in the context of the entire encounter." As such, the judge determined that the circumstances "equate[d] to detention, not arrest," and Cooke's statement was "a fair prediction of the inevitability that a search warrant would issue as a result of the [TRO]."

The judge continued that after the search of defendant's bedroom, when officers tried to speak to F.B., defendant "blurted out" that he had "firearms in the house." The judge explained "[t]he statement was not in response to any questioning" by the officers, but instead was "spurred on by the officers[] engaging [F.B.]." According to the judge, once defendant made that statement,

22

"Chant asked where the firearms were, to which . . . defendant responded that they were in the backyard." The judge found that defendant then "volunteered" "that the guns were not loaded," and that S.L. had seen him holding a gun while he tried to get her "outta the house safely." The judge determined defendant's statements were volunteered and not in response to officers asking him anything. Because defendant was neither in custody nor interrogated, the judge concluded Miranda warnings were not necessary for his statements to be admitted at trial.

We begin with the guideposts that inform our review. "When reviewing a trial court's decision to grant or deny a suppression motion, appellate courts '[ordinarily] defer to the factual findings of the trial court so long as those findings are supported by sufficient evidence in the record.'" State v. Smart, 253 N.J. 156, 164 (2023) (alteration in original) (quoting State v. Dunbar, 229 N.J. 521, 538 (2017)). This is because those findings are "substantially influenced by [the] opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). Thus, "[w]e will set aside a trial court's findings of fact only when such findings 'are clearly mistaken.'" Dunbar, 229 N.J. at 538 (quoting State v. Hubbard, 222 N.J. 249, 262 (2015)). "We accord no deference,

23

however, to a trial court's interpretation of law, which we review de novo." Dunbar, 229 N.J. at 538 (citing State v. Hathaway, 222 N.J. 453, 467 (2015)).

Turning to the substantive legal principles, "[t]he Fourth Amendment and Article I, Paragraph 7 of the State Constitution guarantee individuals the right to be free from unreasonable searches and seizures." State v. Carter, 247 N.J. 488, 524 (2021). "[W]arrantless searches and seizures, 'particularly in a home, are presumptively unreasonable' and 'must be subjected to particularly careful scrutiny.'" State v. Edmonds, 211 N.J. 117, 129 (2012) (quoting State v. Bolte, 115 N.J. 579, 583 (1989)). "Therefore, when the police act without a warrant, the State bears the burden of proving by a preponderance of the evidence not only that the search or seizure was premised on probable cause, but also that it 'f[ell] within one of the few well-delineated exceptions to the warrant requirement.'" State v. Johnson, 193 N.J. 528, 552 (2008) (alteration in original) (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)).

A consent search, relied on by the State in this case to justify the warrantless search, "is one of the well-defined exceptions to the warrant requirement." State v. K.H., 482 N.J. Super. 113, 129 (App. Div. 2025). When a person "consents to [the] search of his [or her] premises, he [or she] relinquishes the Fourth Amendment protection which prohibits unreasonable

searches and seizures." King, 44 N.J. at 352 (citing United States v. Smith, 308 F.2d 657, 663 (2d Cir. 1962)). However, under Article I, Paragraph 7 of the New Jersey Constitution, "any consent given by an individual to a police officer to conduct a warrantless search must be given knowingly and voluntarily." State v. Carty, 170 N.J. 632, 639 (2002).

To be considered voluntary, "the consent must be 'unequivocal and specific' and 'freely and intelligently given.'" King, 44 N.J. at 352 (quoting Judd v. United States, 89 U.S. App. D.C. 64, 66 (D.C. Cir. 1951)). To establish that consent was knowing, the State has the burden to show that the person giving consent "knew that he or she 'had a choice in the matter.'" Carty, 170 N.J. at 639 (quoting State v. Johnson, 68 N.J. 349, 354 (1975)). Courts have recognized that a person is likely to "feel some degree of compulsion whenever a police officer makes a request" for consent to search. State v. Domicz, 188 N.J. 285, 307 (2006). That said, the question whether consent "was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227 (1973).

If it appears consent has been granted "only in submission to a claim of lawful authority," or in response to "threats or force," the resulting search is

deemed unreasonable. Id. at 233. Additionally, New Jersey courts go even further than the United States Supreme Court required in Schneckloth, "requiring the State to prove, as a precondition to the validity of a consent search, that a person have knowledge of his [or her] right to refuse to give consent." Domicz, 188 N.J. at 307; see also Johnson, 68 N.J. at 353-54 (affirming that in New Jersey, "the validity of a consent to a search . . . must be measured in terms of waiver"). "To meet its burden of proof, the State is required to prove voluntariness by 'clear and positive testimony.'" K.H., 482 N.J. Super. at 130 (quoting King, 44 N.J. at 352).

In King, 44 N.J. at 352-53, the Court provided factors trial judges could use as "guideposts" in determining whether a defendant voluntarily consented to a search. The Court declared that some factors "tending to show that the consent was coerced" are:

> (1) that consent was made by an individual already arrested; (2) that consent was obtained despite a denial of guilt; (3) that consent was obtained only after the accused had refused initial requests for consent to search; (4) that consent was given where the subsequent search resulted in a seizure of contraband which the accused must have known would be discovered; [and] (5) that consent was given while the defendant was handcuffed.
>
> [Ibid. (citations omitted).]

26

On the other hand, factors "tending to show the voluntariness of the consent" include:

> (1) that consent was given where the accused had reason to believe that the police would find no contraband; (2) that the defendant admitted his guilt before consent; [and] (3) that the defendant affirmatively assisted the police officers.
>
> [Id. at 353 (citations omitted).]

In articulating these factors, the Court emphasized that it did not intend to "lay down rules of law" that would preclude a judge "from determining the issue of voluntariness of consent by . . . consider[ing] the totality of the particular circumstances of the case" at hand. Ibid. Thus, "the existence or absence of one or more of the above factors is not determinative of the issue," and a given factor's presence or absence "may be of great significance in the circumstances of one case[,] yet be of slight significance in another." Ibid.

Although courts have required that an individual be told of the right to refuse consent to a search, an "occupant's knowledge of the right to refuse [is] not . . . required every time law enforcement officers seek consent to enter a residence." State v. Williams, 461 N.J. Super. 80, 99 (App. Div. 2019). For example, in State v. Padilla, 321 N.J. Super. 96, 102-03 (App. Div. 1999), aff'd, 163 N.J. 3 (2000), police went to a motel room after receiving a tip about a man

entering the room while carrying a handgun.  When a woman came to the door, an officer identified himself and asked if he and his two fellow officers could enter.  Id. at 103.  The woman said "okay" or "yes" and opened the door wide, allowing the officers to enter.  Ibid.

We affirmed the trial court's denial of the defendants' motion to suppress evidence the officers subsequently saw in plain view in the motel room.  Id. at 107-10.  We noted the officers "initially went to the motel, not to search but rather to investigate" the tip concerning a gun.  Id. at 107.  We determined there was "nothing unreasonable about their request for permission to enter the room." Id. at 107-08.  We rejected the defendants' argument that the woman who answered the door did not validly consent to the officers' entry because they did not advise her of a right to refuse such consent.  Id. at 108.

We reasoned that because "the officers did not seek consent to search," but "merely sought permission to enter to continue their investigation," the requirement that police state that an individual has a right to refuse consent to a search was "inapposite."  Ibid.; see also Williams, 461 N.J. Super. at 101 (finding evidence admissible despite the fact that the defendant was not informed of the right to refuse police entry to her home because "the officers were obliged to investigate" based on information they had received that there

might be homicide fugitives inside); State v. Pineiro, 369 N.J. Super. 65, 73-74 (App. Div. 2004) (finding evidence admissible despite the fact that investigators did not inform the defendant of the right to refuse their entry into his apartment because the entry "was the same as that of any other social guest or business visitor," and did not by itself "constitute a Fourth Amendment search").

Similarly well-settled legal principles govern our review of defendant's statements. Under the Fifth Amendment to the United States Constitution, N.J.S.A. 2A:84A-19, and N.J.R.E. 503, no person shall be compelled to be a witness against himself or herself in a criminal case. In Miranda, 384 U.S. at 444-45, the United States Supreme Court held that as a prerequisite to the admissibility of a suspect's statement, police must inform the suspect of the right to remain silent and the right to the presence of an attorney, and tell the suspect that any statement made may be used as evidence against him or her. Miranda warnings are "prophylactic measures designed to ensure that a suspect's decision to speak to the police is knowing and voluntary." State v. Burris, 145 N.J. 509, 519 (1996).

If Miranda warnings are "required but not given, the unwarned statements must be suppressed." Hubbard, 222 N.J. at 265. However, "[i]f a defendant's un-Mirandized statement is admitted into evidence in error, an appellate court

29

will not reverse the conviction unless the error was 'of such a nature as to have been clearly capable of producing an unjust result.'" State v. Ahmad, 246 N.J. 592, 612 (2021) (quoting R. 2:10-2).

Miranda warnings must be given prior to "custodial interrogation," defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way." Miranda, 384 U.S. at 444. Thus, the requirement is "triggered only when a person is in custody and subject to questioning by law enforcement." Ahmad, 246 N.J. at 610 (citing State v. Wint, 236 N.J. 174, 193 (2018)).

"Custody" does not require a formal arrest or the use of handcuffs or other physical restraints, and "may occur in a suspect's home or a public place other than a police station." State v. Lutz, 165 N.J. Super. 278, 285 (App. Div. 1979) (quoting State v. Godfrey, 131 N.J. Super. 168, 175 (App. Div. 1974), aff'd, 67 N.J. 267 (1975)). In that regard, the level of restraint placed on an individual's freedom of movement must be "of the degree associated with a formal arrest." State v. Erazo, 254 N.J. 277, 298 (2023) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).

Whether an individual is "in custody" for <u>Miranda</u> purposes is "a fact-sensitive inquiry," <u>Ahmad</u>, 246 N.J. at 611, involving an "objective" analysis "that focuses on the totality of the circumstances," <u>State v. Brown</u>, 352 N.J. Super. 338, 352 (App. Div. 2002). Some factors to be considered include "the time and place of the interrogation, the status of the interrogator, [and] the status of the suspect" or other individual being questioned or spoken to. <u>State v. P.Z.</u>, 152 N.J. 86, 103 (1997). A court should also consider "the nature and degree of pressure applied to detain the suspect, the duration of the questioning, the physical surroundings, and the language used by police." <u>State v. Timmendequas</u>, 161 N.J. 515, 614 (1999) (citing <u>State v. Smith</u>, 307 N.J. Super. 1, 9 (App. Div. 1997)).

"The rights set forth in <u>Miranda</u> are not implicated 'when the detention and questioning is part of an investigative procedure rather than a custodial interrogation.'" <u>Smith</u>, 307 N.J. Super. at 9 (quoting <u>State v. Pierson</u>, 223 N.J. Super. 62, 66 (App. Div. 1998)). In <u>Smith</u>, we pointed out that "police action subsequent to entering [a] residence" in "response to a call about a domestic dispute" is "likely to involve some restraint on the occupants' freedom of action." <u>State v. Smith</u>, 374 N.J. Super. 425, 431 (App. Div. 2005). We compared the situation to "field investigations of suspicious conduct" and

"traffic stops," two circumstances where police are "not required to give Miranda warnings before asking questions reasonably related to dispelling or confirming suspicions that justify" a brief "detention." Ibid. We held that a person questioned during a police response to a domestic violence report at a home is similarly more likely to be considered "detained" than "in custody." Id. at 431-32.

In Smith, the police officer came to the defendant's residence in response to a report by his wife that he "had choked her and thrown her against [a] wall." Id. at 428. The officer went upstairs to where the defendant was lying in bed, shined a flashlight in his face, and asked him "what happened" and whether he choked his wife. Id. at 429. The officer did not touch the defendant, tell him he could not leave, or put him under arrest until after he admitted his wife's account was true. Ibid. We concluded that the questioning was "neither harassing nor intimidating," and that while the officer's behavior "momentarily restricted [the] defendant's movement," the circumstances were "not the functional equivalent of a formal arrest and Miranda warnings were not required." Id. at 435. Indeed, the "determinative consideration" is whether a reasonable person would, under all the circumstances, "conclude that after brief questioning[,] he or she would

or would not be free to leave." Pierson, 223 N.J. Super. at 67 (citing United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981)).

"Interrogation" need not involve "express questioning"; the term also encompasses "any words or actions . . . (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." Rhode Island v. Innis, 446 U.S. 291, 301 (1980). Nevertheless, as stated by the Miranda Court, "[v]olunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by" Miranda requirements. 384 U.S. at 478.

In Innis, 446 U.S. at 294-95, 303, police officers transporting the defendant after arresting him made "a few offhand remarks" that there was a school for handicapped children near the crime scene and it would be a problem if a child found the gun used in the crime. The defendant interrupted and said he would show the officers where the gun was. Id. at 295. The Court held there was nothing in the record suggesting that the officers knew or should have known that the defendant was "peculiarly susceptible to an appeal to his conscience" or that he "would suddenly be moved to make a self-incriminating response." Id. at 302-03. The Court concluded that the defendant's statements

were admissible because he was not "interrogated" under <u>Miranda</u> and thus warnings were not required.  <u>Id.</u> at 302-04.

In <u>State v. Tiwana</u>, 256 N.J. 33, 36-37 (2023), an officer approached the defendant in her hospital bed and told her he was investigating the accident in which her car struck two police cruisers.  The officer testified that the defendant immediately complained of chest pain and said she "only had two shots prior to the crash."  <u>Id.</u> at 37.  The Court held the defendant's statement was "spontaneous[]" and not made in response to "a custodial interrogation or its functional equivalent."  <u>Id.</u> at 45.

Applying these principles, we agree with the judge's rulings denying defendant's motions to suppress the guns and the statements, and we affirm substantially for the sound reasons articulated in the judge's written opinion. The judge's factual findings are amply supported by sufficient credible evidence in the record and the legal conclusions are unassailable.

As to the guns, defendant argues they should have been suppressed because the searches of his bedroom and the backyard were not based on valid consent.  He asserts the officers' initial entry into the house was unlawful because he was not informed he could refuse to let the officers in.  He also argues he was coerced into consenting to the bedroom search because he denied

threatening S.L. and initially questioned whether he even had authority to consent. He further contends the search of the backyard was invalid because he did not have authority to consent to that search. Lastly, he asserts the judge erred by finding the inevitable discovery doctrine applied as an alternative basis to justify the warrantless search.

We reject defendant's argument that the initial police entry into the residence was improper because the officers did not tell him he could refuse to let them in. The officers responded to the residence to investigate S.L.'s domestic violence report. As in Padilla, Williams, and Pineiro, there was no requirement for the officers to inform defendant of any right to refuse their initial entry into the house, as the entry was "merely sought . . . to continue their investigation." See Padilla, 321 N.J. Super. at 108.

Likewise, we reject defendant's argument that he was coerced into consenting to the bedroom search. Although some of the King factors weighed in favor of a finding that defendant's consent to search his bedroom was coerced, mainly that he denied having guns in the house before consenting, "the existence or absence of one or more . . . factors is not determinative of the issue." 44 N.J. at 353. Instead, based on "the totality of the . . . circumstances," ibid., including the fact that defendant knew the officers would not find guns in his bedroom and

his cordial interaction with the officers before and during the search, we discern no error in the judge's finding that defendant's consent was voluntary. Although defendant questioned whether he could consent to the search because his father owned the house, in the very same sentence he said, he "[didn't] have a problem" with it other than that. Once Cooke explained that defendant could in fact consent to a limited search of his bedroom, defendant agreed to the search without hesitation.

Defendant claims Cooke "threatened" him by saying the officers would search his room and then obtain consent from F.B. for the rest of the house and that if firearms were found, that would be "an issue" they would have to "deal[] with." According to defendant, Cooke's threat vitiated the voluntariness of defendant's consent. However, Cooke's statements appear to have simply been an explanation of how the officers would proceed with the search, which does not equate to coercion. "An officer's comment regarding the inevitability of a search warrant does not indicate coercion if it is 'a fair prediction of events that would follow' rather than 'a deceptive threat made to deprive [an individual] of the ability to make an informed consent.'" State v. Hagans, 233 N.J. 30, 42 (2018) (alteration in original) (quoting State v. Cancel, 256 N.J. Super. 430, 434

36

(App. Div. 1992)).  Here, Cooke's comment was indicative of the former, not the latter.

Equally unavailing is defendant's argument that the search of the backyard was invalid because he did not have authority to consent to the search. "Authority to consent to search a particular area of a home turns on common usage." State v. Cushing, 226 N.J. 187, 201 (2016).  Thus, a "co-habitant" of a residence "who possesses common authority over or has a sufficient relationship to the premises or effects sought to be inspected may voluntarily consent to a lawful search." State v. Lamb, 218 N.J. 300, 315 (2014) (citing United States v. Matlock, 415 U.S. 164, 171 (1974)).  Even if law enforcement "erroneously" believes "a third party possessed common authority over the property to be searched," a warrantless search based on that party's consent is permissible if the belief was "objectively reasonable in view of the facts and circumstances known at the time of the search." State v. Suazo, 133 N.J. 315, 320-21 (1993) (citing Illinois v. Rodriguez, 497 U.S. 177, 186, 188-89 (1990)).

Here, based on defendant's conduct, the officers' belief that he had authority to consent to a search of the backyard was reasonable.  Defendant readily took the officers out to the backyard without asking his father's permission and ushered his dogs into the area as well.  F.B. did not protest that

defendant should not be there or could not authorize police to be there. Because the circumstances reasonably reflected defendant's "common authority" over the backyard, see Cushing, 226 N.J. at 201-02, we are satisfied the search of the backyard was based on valid consent.

Moreover, courts have found that a search is consensual where there is "some form of active initiation by the party who turned over the evidence." State v. Koedatich, 112 N.J. 225, 264 (1988) (italicization omitted). "If a person chooses to disclose contraband or evidence thereof as to which he ordinarily would be protected by virtue of his constitutional rights, without that course being initiated by the police, he does so at his peril." State v. McGivern, 167 N.J. Super. 86, 89 (App. Div. 1979) (finding a valid consent to search where an officer asked defendant if he had luggage in his car and defendant opened the trunk, revealing a noticeable smell of marijuana that the officer then investigated to find illicit drugs).

Here, initially, the officers did not ask defendant if they could search anywhere other than defendant's bedroom. Defendant spontaneously informed them that he had guns. After Chant asked where the guns were located for officer safety, defendant volunteered to take them to the firearms' location in the backyard. Accordingly, we are convinced the search was entirely consensual.

For the sake of completeness, we briefly address the judge's finding that the inevitable discovery doctrine applied as an alternative basis for upholding the search. Evidence is admissible despite an otherwise improper absence of a warrant when it "would inevitably have been discovered without reference to the police error or misconduct." Nix v. Williams, 467 U.S. 431, 448 (1984).

To support such a finding, the State must show that

> (1) proper, normal[,] and specific investigatory procedures would have been pursued in order to complete the investigation of the case; (2) under all of the surrounding relevant circumstances[,] the pursuit of those procedures would have inevitably resulted in the discovery of the evidence; and (3) the discovery of the evidence through the use of such procedures would have occurred wholly independently of the discovery of such evidence by unlawful means.
>
> [State v. Sugar, 100 N.J. 214, 238 (1985).]

For the doctrine to apply, the prosecution must establish these factors by clear and convincing evidence. Id. at 240. It "need not demonstrate the exact circumstances of the evidence's discovery" or "establish the exclusive path leading to the discovery," but may "present facts sufficient to persuade the court" that "such discovery would occur in one or in several ways." State v. Sugar, 108 N.J. 151, 158-59 (1987).

Here, Chant's uncontradicted testimony at the suppression hearing was, absent consent, the officers would have immediately sought a telephonic search warrant. Even prior to defendant's admission that he had firearms at the house, the officers had found gun-related paraphernalia, including ammunition, and defendant had told them he owned firearms. This evidence in conjunction with S.L.'s allegations would have provided sufficient probable cause for a court to issue a search warrant.

Additionally, search and seizure of the firearms would have been authorized along with the issuance of the TRO. The Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -35, empowers a judge to issue a TRO "authorizing the police to search for and seize from the defendant's home, or any other place, weapons that may pose a threat to the victim." State v. Hemenway, 239 N.J. 111, 116 (2019). Because defendant's guns had already been seized, the municipal court judge issued a TRO to S.L. without the search warrant component. However, had the guns not been seized, a warrant would have been issued based on S.L.'s domestic violence allegations. Thus, the judge correctly concluded the guns would have inevitably been discovered.

Turning to the statements, defendant argues that his statements to police should have been suppressed because they were made without prior Miranda

warnings. He asserts that because Cooke said neither he nor the other officers were "going anywhere" until they "figured out" what was going on, he was in "custody for Miranda purposes" when he told police there were guns on the premises and S.L. had seen him holding one. He further contends his interactions with police constituted "interrogation" under Miranda.

We are convinced defendant was not "in custody" when he made the incriminating statements. As in Smith, defendant was in his own home and the officers were investigating a domestic violence report. See Smith, 274 N.J. Super. at 429. Although defendant's movements were somewhat restricted, he was otherwise free to move around and was never physically restrained even after Cooke said no one was "going anywhere" until the situation was "figured out." Thus, we are satisfied defendant was not subjected to restrictions amounting to a formal arrest. See Erazo, 254 N.J. at 298.

Additionally, defendant did not make statements in response to interrogation. Instead, defendant spontaneously blurted out he had guns at the house and confirmed S.L. had seen him holding. At the time, no officer had posed a question to defendant. Similar to Innis, 446 U.S. at 301-02, and Tiwana, 256 N.J. at 45, defendant was not subjected to the "functional equivalent" of interrogation as there was nothing in the record to suggest that the officers knew

or should have known that their action in speaking to F.B. would cause defendant to make incriminating statements. Because defendant was neither in custody nor subjected to interrogation by law enforcement, <u>Miranda</u> was not implicated.

III.

In Point II, defendant argues the judge erred by denying his motion to admit alleged prior false allegations by S.L. against other family members. He asserts the judge's decision violated his right to confront and impeach the main witness against him, and the judge erred by finding he had not demonstrated the prior accusation was truly false.

By way of background, to impeach her credibility, defendant sought to admit testimony and other evidence that S.L. made prior false allegations of physical and sexual abuse against two other relatives. S.L. made these allegations to the Division of Youth and Family Services, now the Division of Child Protection and Permanency (DCPP), in 2011, claiming that while she was living in F.B.'s residence as a child, her grandmother M.B. physically hurt her and her uncle, J.S., sexually assaulted her. A DCPP written summary indicated that S.L. reported these abuses occurred when she was in the third to seventh

A-3302-22

grades. In particular, S.L. reportedly stated J.S. assaulted her on October 31, 2005, the day after her ninth birthday.

At a pretrial N.J.R.E. 104(a) hearing, F.B. testified for defendant that he and his late wife M.B. had obtained custody of S.L. and her sister in 2003 due to the girls' parents' contentious divorce. S.L. was seven years old at the time. According to F.B., J.S., M.B.'s son, also lived in the home with the girls for two years before he left for college.

F.B. recounted that the girls interacted with J.S. "every day," watching television and movies and playing video games together. He said the girls loved J.S. and never "seemed to be afraid of" him. F.B. denied being aware of any issues between S.L. and J.S. and denied that S.L. had ever told him J.S. "sexually assaulted her." F.B. testified further that the girls slept in bunk beds in a bedroom "two feet from" his and M.B.'s bedroom and denied ever hearing or seeing anything inappropriate in the house. Specifically, regarding the alleged October 31, 2005 sexual assault, F.B. testified J.S. went to "Long Island Beach" every Halloween to "part[y]" "with [fifteen] or so of his friends" and presumably would not have been home on October 31, 2005. Similarly, F.B. denied that M.B. ever expressed to him that she had "any issues" with S.L. and he had never observed M.B. physically harm either of the girls.

F.B. testified that in February 2011, when S.L. was fourteen years old, the girls were removed from his home and placed with other relatives. Although DCPP conducted an investigation in connection with the removal, presumably arising from S.L.'s allegations of sexual and physical abuse, F.B. claimed he was never advised about the nature of the investigation nor the results. F.B.'s testimony about the investigation, however, was somewhat contradictory in that at one point, he said he did not recall any allegations by S.L. of sexual assault by J.S. or physical abuse by M.B., and, at another point, he said he had called S.L.'s mother to tell her S.L. "was accusing [J.S.] of molesting her."

F.B. related that in 2015, S.L. returned to his custody because "her father had thrown her out and she didn't have anywhere to go." According to F.B., S.L. had dropped out of school, but she wanted to return and graduate. To that end, F.B. said he and M.B. "had to get residential custody of [S.L.], even though she was [eighteen, because] she had to have a legal guardian to sign her into high school."

The defense submitted a March 30, 2015 custody order confirming that F.B. and M.B. regained custody of S.L. The order indicated that a family part judge "personally interviewed" S.L. and heard testimony from DCPP caseworkers regarding the 2011 investigation. The order noted that in 2011,

44

DCPP had determined that S.L.'s allegations of abuse by J.S. and M.B. were "unfounded."

Following F.B.'s testimony, the State argued that defendant's motion should be denied because defendant had not demonstrated by a preponderance of the evidence that S.L.'s accusations were false. In support, the prosecutor pointed out that during his testimony, F.B. never mentioned a "false accusation." Instead, F.B. testified that he was unaware of any accusations by S.L. against J.S. or M.B. "at the time of the [DCPP] investigation," and only heard of them in 2015. Further, the prosecutor asserted the prior allegations were remote in time, involved different individuals, and were "not similar" to the accusations lodged against defendant. The prosecutor added that any probative value of the information was outweighed by "undue prejudice and confusion of the issues."

Defense counsel countered that it was the very fact that F.B. had never heard of any issues between S.L. and J.S. or M.B. that showed that S.L.'s accusations were false. Further, defense counsel pointed to the 2015 custody order describing the 2011 abuse allegations as unfounded and the family part judge's reliance on that determination to return S.L. to F.B.'s and M.B.'s custody.

The judge agreed with the State and denied defendant's motion to permit testimony related to S.L.'s prior accusations. In support, the judge found nothing

A-3302-22

in F.B.'s "sparse and choppy" testimony that "provided a direct link . . . to him even having knowledge of the victim's allegations" when they were made in 2011.  Thus, the judge agreed the testimony failed to prove by a preponderance of the evidence that S.L.'s prior accusations were false.  Further, the judge found the alleged abuse was "remote[]" in time and did not involve "crimes of a similar nature" as defendant's charges, and there was no evidence S.L. had ever "recanted to any law enforcement [agency]."

Additionally, the judge did not "put[] any weight into the [2015 custody] order," finding that although the family part judge "did consult with [DCPP]" about its 2011 investigation, the family part judge did not have "a complete hearing" about S.L.'s prior accusations in determining whether F.B. and M.B. could take custody of S.L. in 2015.  Thus, the judge found that although the 2015 order referenced the 2011 finding that the allegations were "unfounded," that determination was not a definitive finding of falsehood by S.L.  Ultimately, the judge concluded the evidence did not satisfy N.J.R.E. 608(b)(1) and could not be used to attack S.L.'s "character for truthfulness."

In general, evidence of specific instances of conduct, other than a prior conviction, cannot be used at trial to prove a witness's untruthfulness.  State v. Guenther, 181 N.J. 129, 139-40 (2004).  This prohibition was instituted to

prevent unfairness to witnesses, who may be unprepared to fend off "foraging" into their pasts and who likely will not have their own witnesses ready at trial to defend against any allegations. Id. at 141. It is also meant to prevent "collateral attacks on the general credibility of a witness" that may "cause confusion of the true issues in the case." Id. at 141-42. Indeed, the avoidance of "minitrials" on such "collateral matters" remains the "primary justification for the exclusion of prior acts evidence." Id. at 142.

However, courts have also recognized that a defendant's right to confrontation under the Sixth Amendment to the United States Constitution and Article I, Paragraph 10 of the New Jersey Constitution is "exercised through cross-examination," which is "the most effective means of testing the State's evidence and ensuring its reliability." Id. at 147. As a result, on cross-examination, a witness may be impeached through "extrinsic evidence relevant to the issue of credibility." N.J.R.E. 607(a). "This provision is subject to [N.J.R.E.] 405 and 608." Ibid.

N.J.R.E. 405 governs methods of proving a witness's character that are not pertinent to this appeal. However, under N.J.R.E. 608(b)(1),

> [i]n a criminal case, a witness' character for truthfulness may be attacked by evidence that the witness made a prior false accusation against any person of a crime similar to the crime with which defendant is charged if

the judge preliminarily determines . . . that the witness knowingly made the prior false accusation.

Still, N.J.R.E. 608(b) permits evidence of a witness's specific conduct to prove untruthfulness only "in very narrow circumstances." State v. Byrd, 198 N.J. 319, 348 (2009) (citing Guenther, 181 N.J. at 154). In Guenther, 181 N.J. at 156, our Supreme Court placed limitations on the admission of prior false accusation evidence that was later codified in N.J.R.E. 608(b). The Court held the admission of such evidence was only justified in cases involving "the impeachment of a victim-witness whose credibility was the central issue in the case." Ibid. The Court added that "the introduction of the prior false accusation evidence cannot become the tail wagging the dog; that is, proof of the false accusation cannot become such a diversion that it overshadows the trial of the charges itself." Ibid. In that regard, the Court "disfavor[ed] using the trial of charged offenses as the forum for an extended mini-trial for the collateral determination of a prior criminal accusation." Id. at 156-57.

The decision to permit or preclude evidence of a prior false accusation is left to the trial court's "sound discretion." State v. A.O., 397 N.J. Super. 8, 28 (App. Div. 2007) (quoting Guenther, 181 N.J. at 158). In exercising that discretion, the trial court must conduct an admissibility hearing pursuant to N.J.R.E. 104 and make "detailed findings." A.O., 397 N.J. Super. at 28. At the

hearing, the defendant has the "initial burden" to prove "by a preponderance of the evidence" that "a prior accusation charging criminal conduct was made by the victim" and that the accusation "was false." Guenther, 181 N.J. at 157.

Once the defendant has met the "initial burden" of demonstrating the accusation was false, trial courts must decide whether to admit the evidence. Ibid. To guide trial courts, the Guenther Court set forth the following inexhaustive list of additional factors to consider:

> 1. whether the credibility of the victim-witness is the central issue in the case;
>
> 2. the similarity of the prior false criminal accusation to the crime charged;
>
> 3. the proximity of the prior false accusation to the allegation that is the basis of the crime charged;
>
> 4. the number of witnesses, the items of extrinsic evidence, and the amount of time required for presentation of the issue at trial; and
>
> 5. whether the probative value of the false accusation evidence will be outweighed by undue prejudice, confusion of the issues, and waste of time.
>
> [Ibid.]

Even if the trial court determines the prior false accusation is admissible, it retains discretion "to limit the number of witnesses who will testify concerning

the matter at trial," to prevent the collateral issue from becoming "a second trial, eclipsing the trial of the crimes charged." Ibid.

Based on these principles, we discern no abuse of discretion in the judge's denial of defendant's motion to admit evidence of S.L.'s prior accusations against J.S. and M.B. We agree with the judge that defendant did not demonstrate by a preponderance of the evidence that the accusations were false. F.B.'s testimony showed he knew little about S.L.'s accusations until she sought to return to his and M.B.'s home in 2015. Further, the 2015 family court order allowing S.L. to return to F.B. and M.B.'s custody made no specific findings concerning S.L.'s prior accusations other than reiterating that DCPP had determined the allegations were "unfounded."

"Unfounded" is a specific term utilized by DCPP after investigating an allegation of abuse or neglect. N.J.A.C. 3A:10-7.3(c)(4). An allegation is deemed "unfounded" "if there is not a preponderance of the evidence indicating that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21, and the evidence indicates that a child was not harmed or placed at risk of harm." Ibid. Although DCPP's "unfounded" finding undoubtedly undermines S.L.'s prior allegations, it does not definitively establish that the allegations were false.

Even if DCPP's "unfounded" determination was sufficient to satisfy defendant's initial burden to show that the allegations were "false" under N.J.R.E. 608(b)(1), the text of the rule and the additional factors set forth in Guenther, 181 N.J. at 157, supported the judge's denial of defendant's motion. First, S.L.'s accusations against M.B. and J.S. did not concern "crime[s] similar to the crime with which defendant [was] charged" as required by N.J.R.E. 608(b)(1). Second, the allegations were remote in time from the crimes charged. While S.L.'s prior allegations made in 2011 concerned conduct she claimed occurred years earlier, the current charges against defendant stemmed from a report she made to police in 2019. See Guenther, 181 N.J. at 157.

Lastly, cross-examining S.L. about the prior allegations could easily have led to exactly the kind of "minitrial" the Guenther Court sought to prevent when setting out its criteria for admissibility. Id. at 142. The introduction of documentary evidence, such as DCPP and other family court records, as well as F.B.'s related testimony had a strong potential to confuse the issues at trial and take the focus off defendant's charges by converting the trial into an unrelated investigation into whether J.S. or M.B. committed crimes against S.L. Although S.L.'s credibility was a "central issue" in the case, any probative value of her

prior accusation was outweighed by the risk of undue prejudice, confusion of the issues, and waste of time. Id. at 156-57.

IV.

In Point III, defendant argues the verdict was impermissibly inconsistent. According to defendant, because the "unlawful purpose" described in the judge's instruction on the possession of a weapon for an unlawful purpose charge was "to terrorize S.L.," the jury's decision acquitting him of terroristic threats "negated" that element of the weapon charge. Thus, defendant asserts the jury could not have properly found him not guilty of terroristic threats but guilty of possessing a weapon for the purpose of terrorizing the victim.

In Dunn v. United States, 284 U.S. 390, 393 (1932), the United States Supreme Court held that consistency in a verdict "is not necessary" because "[e]ach count in an indictment is regarded as if it was a separate indictment." Decades later, in United States v. Powell, 469 U.S. 57 (1984), the Court reaffirmed the Dunn rule and reiterated that inconsistent verdicts are acceptable and non-reviewable, explaining:

> As the Dunn Court noted, where truly inconsistent verdicts have been reached, "[the] most that can be said . . . is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt." Dunn, [284 U.S.]

52

at 393. The rule that the defendant may not upset such a verdict embodies a prudent acknowledgment of a number of factors. First, as the above quote suggests, inconsistent verdicts -- even verdicts that acquit on a predicate offense while convicting on the compound offense -- should not necessarily be interpreted as a windfall to the Government at the defendant's expense. It is equally possible that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense.

[Powell, 469 U.S. at 64-65 (omission in original).]

The Court rejected the idea that defendants should be permitted "to challenge inconsistent verdicts on the ground that in their case the verdict was not the product of lenity, but of some error that worked against them," holding that addressing such challenges would be "imprudent and unworkable." Id. at 66. The Court added that consideration of such an argument on appeal "would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." Ibid.

New Jersey courts have adopted the same rule. See State v. Banko, 182 N.J. 44, 53 (2004) ("Inconsistent verdicts are accepted in our criminal justice system." (citing State v. Grey, 147 N.J. 4, 11 (1996))). In Banko, 182 N.J. at 54, our Supreme Court commented, "[w]e permit inconsistent verdicts . . . because it is beyond our power to prevent them," and because "[w]e do not

53

speculate why a jury acquits." Thus, "a claim of inconsistent verdicts will not invalidate a conviction," id. at 55, as long as "there is sufficient evidence to permit a rational factfinder to find a defendant's guilt beyond a reasonable doubt on the charges on which the defendant was convicted." State v. Ellis, 299 N.J. Super. 440, 455-56 (App. Div. 1997).

This is so "even if the defendant [was] acquitted of certain charges having an element necessary to the charges for which [that defendant] was convicted." Id. at 458. See Banko, 182 N.J. at 56-57 (upholding defendant's conviction for possession of a weapon for an unlawful purpose despite his acquittal for aggravated assault with a firearm, attempted aggravated sexual assault, and kidnapping where the jury "could have been convinced" that defendant possessed a gun for an unlawful purpose but not that the purpose rose to the level of an aggravated assault or kidnapping or that his conduct was "pressed to the stage" of attempted aggravated sexual assault).

Here, the fact that defendant was acquitted of the substantive charge of terroristic threats is neither inconsistent with nor fatal to his conviction for possession of a weapon for an unlawful purpose. There are four elements to possession of a weapon for an unlawful purpose under N.J.S.A. 2C:39-4(a)(1): "(1) the object possessed was a firearm; (2) defendant possessed it; (3) the

54

purpose of the possession was to use the firearm against another's property or person; and (4) defendant intended to use it in a manner that was unlawful." Banko, 182 N.J. at 56-57.

The judge instructed the jury accordingly. On the fourth element, the judge told the jury the State contended defendant's "unlawful purpose in possessing the firearm was to terrorize, threaten or coerce . . . [S.L.] by racking and displaying a handgun as well as [making] verbal threats" as she was leaving [F.B.]'s house. The judge defined "terrorize" as "creat[ing] a state of mind induced by the apprehension of hurt from some hostile or threatening event of manifestation of fear caused by the appearance of danger." The judge instructed the jurors they had to decide if the State had proven "the specific unlawful purpose charged."

Under N.J.S.A. 2C:12-3(a), in pertinent part, a person is guilty of terroristic threats if that person "threatens to commit any crime of violence with the purpose to terrorize another . . . ." The judge instructed the jurors that to find defendant guilty, they had to find defendant "threatened to commit any crime of violence," and that the threat was "made with the purpose to terrorize" S.L. The judge told the jury the State had alleged defendant "threatened to commit the violent crime of causing serious bodily injury," and then defined

"serious bodily injury" as an injury which creates "a substantial risk of death" or which causes "serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." The judge said defendant's "words or actions" had to be "of such a nature as to convey menace or fear of a crime or violence to the ordinary person."

The judge also instructed the jury on the lesser-included offense of harassment under N.J.S.A. 2C:33-4(c). That statute provides, in pertinent part, that a person commits a petty disorderly persons offense if, "with the purpose to harass another," the person "[e]ngages in [a] . . . course of alarming conduct . . . with purpose to alarm or seriously annoy such other person." Ibid. The judge informed the jury that to find defendant guilty of harassment, it had to find he engaged in a course of alarming conduct, meaning that his conduct or acts were "intended to cause alarm or serious annoyance," and were not "merely irritating, nettlesome, or vexing." The judge also told the jury it had to find defendant had a "purpose to harass" S.L. by engaging in the conduct.

The State's proofs included defendant's statements to police admitting to possessing a handgun and to brandishing the handgun in S.L.'s presence, as well as S.L.'s testimony recounting her interactions with defendant. We are satisfied there was sufficient evidence in the record to permit a rational jury to find

defendant's guilt beyond a reasonable doubt on the gun possession charge. "The jury did not have to believe all of the victim's testimony, and may have found some aspects of defendant's story more credible." Banko, 182 N.J. at 57. The jury may have found defendant's action in waving his gun toward S.L.'s car did not constitute a threat to commit "serious bodily injury" for purposes of finding that a terroristic threat was made, but was otherwise unlawful. "Nonetheless, we simply need not engage in such a parsing of the evidence" to reject defendant's inconsistent verdicts claim. Ibid.

## V.

In Point IV, defendant argues the judge erred by denying his request to sentence him one degree lower in the third-degree range for the gun possession charge pursuant to N.J.S.A. 2C:44-1(f)(2). He also challenges the judge's assessment of the aggravating and mitigating factors.

We review sentences "in accordance with a deferential standard," State v. Fuentes, 217 N.J. 57, 70 (2014), and are mindful that we "should not 'substitute [our] judgment for those of our sentencing courts.'" State v. Cuff, 239 N.J. 321, 347 (2019) (quoting State v. Case, 220 N.J. 49, 65 (2014)). Thus, we will

> affirm the sentence unless (1) the sentencing guidelines were violated; (2) the aggravating and mitigating factors found by the sentencing court were not based upon competent and credible evidence in the record; or

(3) "the application of the guidelines to the facts of [the] case makes the sentence clearly unreasonable so as to shock the judicial conscience."

[Fuentes, 217 N.J. at 70 (alteration in original) (quoting State v. Roth, 95 N.J. 334, 364-65 (1984)).]

Under the sentencing guidelines, "a sentencing court first must determine, pursuant to N.J.S.A. 2C:44-1(a) and (b), whether aggravating and mitigating factors apply. After balancing the factors, the trial court may impose a term within the permissible range for the offense." State v. Bieniek, 200 N.J. 601, 608 (2010). We do not "'substitute [our] assessment of aggravating and mitigating factors' for the trial court's judgment." State v. Miller, 205 N.J. 109, 127 (2011) (quoting Bieniek, 200 N.J. at 608).

Here, the judge sentenced defendant to the minimum term permissible– five years in prison, with a forty-two-month period of parole ineligibility, for second-degree possession of a weapon for an unlawful purpose, and a concurrent thirty days for the petty disorderly persons offense of harassment.[3] The judge

_____

[3] Under the Graves Act, N.J.S.A. 2C:43-6(c), a sentence for second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a), must include a mandatory minimum term of one-half the sentence imposed or forty-two months, "whichever is greater." Under N.J.S.A. 2C:43-6(a)(2), a sentence for a second-degree crime must be between five and ten years, and, under N.J.S.A. 2C:43-8, a sentence for a petty disorderly persons offense may not exceed thirty days.

found aggravating factors nine and fourteen based on the "overwhelming need to deter the use of handguns," and because the offense involved "an act of domestic violence . . . committed in the presence of a child." See N.J.S.A. 2C:44-1(a)(9), (14). The judge found mitigating factors seven and eight because defendant had no prior criminal history and the circumstances were unlikely to recur given the restraining order prohibiting defendant from possessing firearms in New Jersey. See N.J.S.A. 2C:44-1(b)(7), (8). After weighing the factors, the judge determined "the aggravating factors outweigh[ed] the mitigating factors."

Defendant argues the judge should have given less weight to aggravating factor nine as it "related only to general deterrence." "Deterrence has been repeatedly identified in all facets of the criminal justice system as one of the most important factors in sentencing," State v. Megargel, 143 N.J. 484, 501 (1996), and "demands for deterrence are strengthened in direct proportion to the gravity and harmfulness of the offense," State in the Int. of C.A.H., 89 N.J. 326, 337 (1982). Aggravating factor nine encompasses both a sentence's "general deterrent effect on the public [and] its personal deterrent effect on the [individual] defendant." Fuentes, 217 N.J. at 79 (quoting State v. Jarbath, 114 N.J. 394, 405 (1989)) (first alteration in original). Of the two concepts, specific deterrence is considered the more important. See ibid. Contrary to defendant's

contention, the judge found both a general need to deter improper handgun use and a specific need to deter defendant from such use in the future. As the judge pointed out, "it was just an argument and [defendant] brought a gun" so "that type of conduct . . . needs to be deterred."

Defendant argues further the judge should have given more weight to mitigating factor seven. He also asserts the judge erred in rejecting defense counsel's arguments that mitigating factors three, nine, and eleven applied. See N.J.S.A. 2C:44-1(b)(3) ("The defendant acted under strong provocation. . . ."); N.J.S.A. 2C:44-1(b)(9) ("The character and attitude of the defendant indicate that the defendant is unlikely to commit another offense . . . ."); N.J.S.A. 2C:44-1(b)(11) ("The imprisonment of the defendant would entail excessive hardship to the defendant or the defendant's dependents. . . .").[4]

A court has "more discretion" in identifying mitigating factors than "aggravating factors." State v. Blackmon, 202 N.J. 283, 297 (2010).

---

[4] For the first time on appeal, defendant argues that mitigating factor ten applied. See N.J.S.A. 2C:44-1(b)(10) ("The defendant is particularly likely to respond affirmatively to probationary treatment. . . ."). We reject the argument out of hand. Mitigating factor ten is inapplicable because "probationary treatment" was not a sentencing option for defendant's Graves Act offense. In the absence of a waiver in accordance with N.J.S.A. 2C:43-6.2, the Graves Act requires that a person convicted of possession of a firearm for an unlawful purpose "shall be sentenced to a term of imprisonment by the court." N.J.S.A. 2C:43-6(c).

"[M]itigating factors that are suggested in the record, or are called to the court's attention, ordinarily should be considered and either embraced or rejected on the record." Ibid. Indeed, a court may not "simply decline to take into account a mitigating factor that is fully supported by the evidence." State v. Dalziel, 182 N.J. 494, 505 (2005). If a factor is so supported, it "must be part of the deliberative process." Ibid.

Here, the judge considered all the mitigating factors defendant requested but found that other than mitigating factors seven and eight, they were not supported by the record. While acknowledging defendant was likely "frustrated" by "the culmination of a lot of factors," including his long work shift, F.B.'s medical condition, and the victim's complaints about the dogs, the judge found this was not the type of "provocation" contemplated by mitigating factor three. See State v. Jasuilewicz, 205 N.J. Super. 558, 576 (App. Div. 1985) (explaining "'the strong provocation' described in N.J.S.A. 2C:44-1[(b)](3) . . . relates to the conduct of the victim towards the actor").

In rejecting mitigating factor nine, the judge found defendant had not "taken responsibility" for his actions. In addressing mitigating factor eleven, the judge acknowledged there had been testimony defendant had come to New Jersey "to care for his ailing father." However, the judge found no support in

the record that defendant's imprisonment would pose a hardship to F.B. because there was no "documentation" of F.B.'s illness and F.B. had been able to "[come] to court several times on his own" and "handle[] himself on the stand." Because the judge's assessment of the mitigating factors and the weight accorded the factors were supported by sufficient evidence in the record, <u>Miller</u>, 205 N.J. at 127, we discern no abuse of discretion, <u>Blackmon</u>, 202 N.J. at 297.

Finally, defendant argues the judge erred in rejecting his request for a downgrade to a term one degree lower for sentencing purposes pursuant to N.J.S.A. 2C:44-1(f)(2).

> Under N.J.S.A. 2C:44-1(f)(2), when the court considers imposing a sentence one degree lower than the crime for which a defendant has been convicted, it must apply a two-step process. The judge "must be clearly convinced that the mitigating factors substantially outweigh the aggravating ones and that the interest of justice demands a downgraded sentence." <u>State v. L.V.</u>, 410 N.J. Super. 90, 109 (App. Div. 2009) (quoting <u>Megargel</u>, 143 N.J. at 496) (internal quotation marks omitted).
>
> [<u>State v. Rice</u>, 425 N.J. Super. 375, 384 (App. Div. 2012) (citations reformatted).]

The focus in the second part of the inquiry is "on the offense and not the offender," <u>State v. Lake</u>, 408 N.J. Super. 313, 326 (App. Div. 2009), and the reasons for the downgrade must be "'in addition to, and separate from,' the

mitigating factors," State v. Locane, 454 N.J. Super. 98, 121 (App. Div. 2018) (quoting State v. Jones, 197 N.J. Super. 604, 607 (App. Div. 1984)).

"[T]he standard governing downgrading is high." Megargel, 143 N.J. at 500. To that end, "[t]he lenity discretion conferred in N.J.S.A. 2C:44-1[(f)](2) must be exercised sparingly, where the special qualities of a particular case support" a downgraded sentence. State v. Lopez, 395 N.J. Super. 98, 108 (App. Div. 2007) (quoting Megargel, 143 N.J. at 503). As such, the decision to downgrade a sentence must be based on "compelling reasons" that "arise from within the context of the offense itself," Lake, 408 N.J. Super. at 326, and the court should explicitly state on the record why a downgraded sentence is "more appropriate" than "the lowest range of sentencing" for the offense. Megargel, 143 N.J. at 502.

Here, the judge did not find that the mitigating factors "substantially outweigh[ed] the aggravating factors" as required by the statute. N.J.S.A. 2C:44-1(f)(2). Further, defendant has not advanced, either at sentencing or on appeal, "compelling reasons" associated with his offense to demonstrate that the interest of justice would be served by a downgrade. Because the judge fairly assessed the aggravating and mitigating factors and already imposed the lowest term permitted by law, a downgrade was not warranted.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3302-22